1  EDWARD W. BURNS                      SBN 201913
   BURNS, SCHALDENBRAND & RODRIGUEZ
2  1155 Sportfisher Dr., Suite 120, Oceanside, CA 92045
   TEL:  (760) 453-2189, FAX:  (760) 453-2194
3
   KACEY GARDNER                        SBN 168299
4  LAW OFFICES OF KACEY GARDNER
   7 Fourth Street, Suite 7, Petaluma, CA 94952
5  Tel:    (707) 763-4900, Fax:  (707) 763-4903

6  Attorneys for Plaintiff,
   TIMOTHY GARDNER
7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11  TIMOTHY GARDNER,                    NO.  C10-03410 EMC

12            Plaintiff,                PLAINTIFF TIMOTHY GARDNER'S
                                        MEMORANDUM OF POINTS AND
13                                      AUTHORITIES IN SUPPORT OF
                                        PLAINTIFF'S OPPOSITION TO
14        vs.                           DEFENDANT'S MOTION FOR
                                        SUMMARY JUDGMENT OR IN THE
15  CITY OF BERKELEY, and DOES 1 through  ALTERNATIVE SUMMARY
    50.                                 ADJUDICATION
16
              Defendants.               DATE: Dec. 23, 2011
17                                      TIME:  1:30 pm
                                        RM:    C, 15th Floor
18

19

20

21

22                  **TABLE OF CONTENTS**

23

I.    INTRODUCTION.     .       .       .       .       .       .       .       .       1

II.   STATEMENT OF THE CASE AND MATERIAL FACTS
      CREATING TRIABLE ISSUES.     .       .       .       .       .       1

III.  LEGAL ARGUMENT.     .       .       .       .       .       .       .       5

      A. DEFENDANT'S  MOTION SHOULD BE DENIED BECAUSE IT
         HAS FAILED TO MEET ITS BURDEN.     .       .       .       .       5

1       1.  Law Regarding Motions Summary Judgment.     .     .     .     5

2.  Defendant's Distortion Of Facts And Attempt To Hide Triable Issues Of Material Fact Are Grounds Alone To Deny Motion.     .     5

        i.  Defendant Grossly Distorts Plaintiff's Employment History.     6

       ii.  Defendant's Assertion That Plaintiff Was Denied Rehire Due To One Sustained Complaint Is Pretext and A Deliberate Attempt To Hide Triable Issues.     .     .     .     8

      iii.  Defendant's Characterization Of Plaintiff's Multiple Complaints Is A Gross Misstatement of Fact and An Attempt to Hide Triable Issues.     .     .     .     8

3.  Defendant's Assertion That Plaintiff Failed To Disclose A Diversion On His Original Application For Hire Is An Attempt To Hide Triable Issues.     .     .     .     .     9

B.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S FIRST CAUSE OF ACTION FOR DISABILITY DISCRIMINATION - DISPARATE TREATMENT.     .     .     .     .     .     9

       1.  Defendant's Claimed Legitimate Business Interests Are A Pretext For Discrimination And Are Not Supported By Evidence.     .     .     9

        i.  Evidence That Defendant's Decision Was Motivated By Discrimination.     .     .     .     .     10

       ii.  Evidence That Defendant's Proffered Explanations Are Not Credible.  .     .     .     .     12

2.  Defendant's Falsity Of Explanation And Shifting Rationales For Not Rehiring Plaintiff Create An Inference Of Discrimination.     .     13

3.  Insidious Language Used By Defendant Establish Facts By Which A Jury Could Find Discrimination.     .     .     .     .     13

C.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S SECOND CAUSE OF ACTION FOR DISABILITY DISCRIMINATION - REASONABLE ACCOMODATION.     .     .     .     .     14

       1.  FEHA'S Accommodation Requirements Were Not Met.     .     14

D.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S THIRD CAUSE OF ACTION FOR DISABILITY DISCRIMINATION - FAILURE TO ENGAGE IN INTERACTIVE PROCESS.     .     .     .     15

E.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S
    FOURTH CAUSE OF ACTION FOR DISABILITY DISCRIMINATION –
    RETALIATION.  .  .  .  .  .  .  .  .  16

F.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S
    FIFTH CAUSE OF ACTION FOR DISABILITY DISCRIMINATION –
    HARASSMENT.  .  .  .  .  .  .  .  .  16

    1.  Law On Continuing Violations Doctrine.  .  .  .  .  16

    2.  Plaintiff's Claims Fall Under Continuing Violations Doctrine.  .  17

G.  MEDICAL RETIREES HAVE A CONTINUING EMPLOYEE/EMPLOYER
    RELATIONSHIP AND ONGOING REINSTATEMENT RIGHTS.  .  19

    1.  BPD's Memorandum Of Understanding "MOU" Is Pretextual
        When Applied To Medical Retirees. .  .  .  .  .  19

    2.  Government Code Supports Ongoing Reinstatement Rights.  .  20

    3.  CalPERS Supports Ongoing Reinstatement Rights. .  .  .  20

    4.  Defendant Has A Pattern And Practice Of Disability
        Discrimination Toward Medically Retired Officers. .  .  .  21

H.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S
    SIXTH CAUSE OF ACTION FOR DISABILITY DISCRIMINATION –
    FAILURE TO PREVENT DISCRIMINATION.  .  .  .  .  24

I.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S
    SEVENTH CAUSE OF ACTION FOR DISABILITY DISCRIMINATION -
    VIOLATION OF CIVIL RIGHTS LAWS UNDER 42 U.S.C. § 1983 & 1985  25

J.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S
    EIGHTH  CAUSE OF ACTION FOR DISABILITY DISCRIMINATION -
    VIOLATION OF CALIFORNIA CONSTITUTION ARTICLE I, §7.  .  25

IV.  CONCLUSION.  .  .  .  .  .  .  .  .  .  25

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Aman v. Cort Furniture Rental Corp.* (1996) 85 F3d 1074, 1083.   .   .   .   14

*Celotex Corp. v. Catrett*, (1986) 477 U.S. 317, 323 . .   .   .   .   .   5

*Berry v. Board of Sup's of L.S.U.* (5th Cir. 1983) 715 F.2d 971.   .   .   .   16,17

*Cornwell v. Electra Cent. Credit Union* 439 F.3d 1028 (9th 2006).   .   .   16

*Counts v. Reno* (D.Hawaii 1996) 949 F.Supp. 1478, 1484-1486.   .   .   17

*Fielder v. UAL Corp.* (9th Cir. 2000) 218 F.3d 973, 987-988 .   .   .   17

*Filipovic v. K&R Exp. System Inc.* (7th Cir. 1999) 176 F.3d 390, 396 .   .   16

*Lewis v. Board of Trustees of Alabama State Univ.* (M.D.Ala. 1995) 874 F.Supp. 1299   16

*Moskowitz v. Trustees of Purdue University* (7th Cir. 1993) 5 F.3d 279.   .   .   16

*Nationwide Life Is. Co. v. Bankers Leasing Ass'n, Inc* (2nd Cir. 1999) 182 F.3d 157.   5

*Nunez v. Superior Oil Co.* (5th Cir 1978) 572 F.2d 1119, 1126.   .   .   .   6

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).   .   .   6,13

*Sabree v. United Broth. of Carpenters & Joiners* (1st Cir. 1990) 921 F.2d 396, 402.   16

*Sischo-Nownejad v. Merced Comm. College Dist.*(9th Cir. 1991)934 F.2d 1104, 1111.   6

*Southern California Gas Co. v. City of Santa Ana* (9th Cir. 2003) 336 F.3d 885, 888.   5

*T.W. Elec. Serv. v. Pacific Elec. Contractors Association* (9th Cir 1987)809 F.2d 626.   5

*UMG Recordings, Inc. v. Sinnott* (ED Cal 2004)300 F.Supp.2d 993, 997   .   .   5

*United States v. One Parcel of Real Property* (9th Cir. 1990) 904 F.2d 487, 491-92.   8

**STATE CASES**

*Morgan v. Regents of the University of California* (2000) 88 Cal.App.4th 52.   .   16

*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243.   .   .   .   .   6

*Richards v. CH2M, Inc.* (2001) 111 Cal.Rptr.2d 87, 26 Cal.4th 789. .   .   .   17

*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 895-896.   .   .   .   16

*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028.   .   .   .   .   16

*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1383.   .   .   .   14

**FEDERAL RULES AND STATUTES**

42 U.S.C. §§ 1983, 1985 .   .   .   .   .   .   .   .   .   .   25

Section 7 Article 1, California Constitution. .        .        .        .        .        .        25

**STATE RULES AND STATUTES**

California Government Code § 21175.        .        .        .        .        .        .        20

California Government Code § 21192.        .        .        .        .        .        .        15, 20

California Government Code § 21193.        .        .        .        .        .        .        20

California Government Code § 21196.        .        .        .        .        .        .        20

California Government Code, § 12940 .        .        .        .        .        .        .        14,

**OTHER**

Brenner & March, *Use and Abuse of MSJs: A View from the Bench* (2007)
49 Orange County Law 34, 37.        .        .        .        .        .        .        .        6

## I.   INTRODUCTION

Over the last two decades, Defendant, the City of Berkeley, has built a cleverly concealed, yet blatantly hostile barrier to reemployment for Plaintiff and all disabled Berkeley Police Officers. This barrier circumvents ADA laws and other policies ensuring employees and applicants are treated fairly. As a deterrent to injury and disability claims, and to avoid setting a precedent for what has yet to be a first - the reinstatement or rehiring of an injured former Berkeley Police Officer - Defendant is refusing to reinstate or rehire Plaintiff. To defend its position, Defendant has introduced inadmissible records, unfounded arguments, and broad distortions of information that, when presented in their proper context, are a matter of routine police department affairs and create no bar to promotional or rehire opportunities of non-injured Berkeley officers.

The material facts in this case have created an avalanche of triable issues about how egregious and illegal Defendant's treatment of Plaintiff has been. The outrageous framing of their supposed "facts" in the MSJ of Plaintiff's discipline record is misleading at best, and is nothing less than another attempt to distract attention from the real issues. Contrary to Defendant's distortions and insinuations about Plaintiff's character, stands an unblemished record of honorable service as a Berkeley Police Officer that is reflected by one phrase--repeated throughout his documented records and in the opinions of those who supervised him and worked alongside him: **Consummate professional**.

The wild distortions of Plaintiff's character and Defendant's repeated egregious, illegal treatment of Plaintiff presents a multitude of facts for a jury to determine what went wrong, and who should be held accountable.

## II.   STATEMENT OF THE CASE AND MATERIAL FACTS CREATING TRIABLE ISSUES

Plaintiff applied for the job of police officer with the City of Berkeley in 1995 and was selected with three other recruits. Plaintiff finished in the top three from among a class of seventy recruits, finishing well ahead of his Berkeley academy mates. Contrary to Defendant's derisive portrait of Plaintiff's "short" career, and his allegations of problems with "discipline," Plaintiff was in fact, a highly respected, hard-working police officer who was regularly commended for his outstanding performance, given high praise, and exceptional performance reviews by his supervisors, and was eventually selected and served in several special assignments after a competitive application process. [PDF Exhibits 1-4] [PDF Exhibit 29] He later tested for, and was placed on, the promotional list for sergeant, and at one point served as an "acting sergeant" in a Special Assignment. [PDF Exhibit 5] During his years of

policing however, Plaintiff sustained an on-duty injury resulting in lengthy medical care and an eventual surgery. During his initial treatment Plaintiff was told he should disregard his doctor's orders and come into work. Upon his return to work after his approximately three week recovery period, he was berated for following his doctor's advice and threatened with having his career cut short if he continued to follow his doctor's orders. [Plaintiff Decl.¶.5]

Eventually Plaintiff was retired when his treating physician placed several restrictions on his job performance that the department found unacceptable. [Plaintiff Decl. ¶.20]

After retirement and his award of a lifetime pension based on his disability, Plaintiff rehabilitated himself and subsequently contacted the Berkeley Police Department. Defendant steered Plaintiff into a hiring process that was specifically designed for permissive resignations and had nothing to with the process of disability retirement reinstatement. [PDF Exhibit 6] Plaintiff then received an independent medical testing of his former restrictions and was cleared to perform the essential job functions of a police officer. [Plaintiff Expert, LacalleDecl.¶3,4,5] Thus, began a long struggle by Plaintiff to regain his former profession.

In Defendant's effort to mask the real reason behind denying Plaintiff reinstatement, they have offered an unbroken string of shifting rationales. He was told in writing by Chief of Police that chief had no role in re-instating retired officers, and that Plaintiff had to ask Human Resources to be put on an "eligibility list." [PDF Exhibit 6] Plaintiff was then informed, through a colleague of his, that the Captain who had initially informed Plaintiff about the perils of his impending retirement, suspected his request for reinstatement was motivated by greed and that he would quickly succumb to another injury just to get more money under the more lucrative, recent employment contract. [Frankel Depo.Page30Line6]

Plaintiff made numerous inquiries while attempting to ignore these prejudicial statements and then contacted the Personnel and Training division of the Berkeley police department.  He was then told in a rather hostile email from the supervisor of the personnel division that she had never even heard of his application and placement on an "eligibility list," but that it mattered not, because there was a "hiring freeze" and it was "a bad time to be looking for a job around here." The supervisor even went so far as to state that, although she had not heard of his application, she had approached the Administrative Captain to inquire about Plaintiff's claim and he denied knowledge of Plaintiff's request, (although several months after it had been confirmed in writing that he was on the eligibility list.) [PDF Exhibit 7]

1    Despite the claimed "hiring freeze," the department subsequently hired two other officers, including
2    a Berkeley patrol captain's son who soon became the target of a law enforcement sting operation for on-
3    duty theft. [Plaintiff Decl.¶26]
4        When Plaintiff sought redress by filing a Writ he was told in a court pleading by Defendant that
5    reinstating retired officers was the Chief's sole decision after all, and the Chief had decided not to hire
6    Plaintiff because he - in the face of overwhelming documentation to the contrary - was a bad employee.
7        In 2006, a newly promoted sergeant approached Plaintiff and asked if Plaintiff would like him to
8    make inquiries about being reinstated.  The Sergeant's motive was three fold: the department had a dire
9    need of able officers; the sergeant knew first hand Plaintiff's true nature, character, and ability; and that
10   a new Police Chief had just taken over and might be more negotiable to reinstating formerly injured
11   officers. That sergeant was wrong. They refused his overture with a pre-textual excuse that Plaintiff was
     not well-liked by the black command staff. [Frankel Depo.38Line2]
12       Plaintiff sought the further advice of the CALPER's Pension analyst who directed him to both the
13   CALPERS manual and application [PDF Exhibits 25,26] covering reinstatement from a disability. Per
14   the advice and the language of both the manual and Government Code, Plaintiff made a written request
15   of Defendant for reexamination, a meeting, accommodation, and reinstatement. [Plaintiff
16   Decl.¶.30][PDF Exhibit 21] Defendant instructed Plaintiff that they would not reinstate him, and that he
17   was no longer eligible for reinstatement, no matter the status of his disability. Defendant further stated
18   that the earlier "eligibility list" upon which Plaintiff's name was placed, had since expired because the
19   two year window had passed and he was barred for life from reinstatement under those terms. Defendant
20   then informed Plaintiff that if he wanted consideration for future employment, he could apply as a "new
21   hire," alongside all other officers in any of the upcoming open recruitments. [Plaintiff Decl.¶.30] [PDF
     Exhibit 8]
22       Because Plaintiff had learned that the department had never rehired or reinstated a disabled officer
23   even upon the officer's request, he was confused by an instruction that made no mention of how they
24   would reexamine him, thus making him once again "eligible." Plaintiff wrote back asking them to: one,
25   reconsider their instruction and meet with and/or re-examine him; and two, clarify the authority the
26   Defendant was relying on in telling Plaintiff to apply as if he had no disability. Plaintiff received no
27   further correspondence other than a written statement that Defendant would take "no further action" on
28   his request for reinstatement. [Plaintiff Decl. ¶.30] [PDF Exhibit9]

1    Although misled about eligibility lists once before, Plaintiff hoped that if he did everything

2  Defendant advised him to do, he might finally be treated fairly.  He immediately paid for, and attended a

3  three week academy to qualify for the "Lateral Application." After successfully re-certifying, he applied

4  per Defendant's invitation, submitting a typical new hire written application. [Plaintiff Decl.¶.30]

5  Plaintiff's application was accepted without comment, and no persons from either Human Resources or

6  the Police Department contacted Plaintiff to inquire about the status of his disability or his request for

7  accommodation. No one contacted him to inquire about his ability to do the essential job functions or

8  about reexamining him. They simply approved him to sit for an oral board interview like all new hires in

   front of three Berkeley sergeants. [Plaintiff Decl.¶.30]

9    When Plaintiff made inquiries as to the status of his background, another "hiring freeze" was relayed

10  to Plaintiff by Personnel and Training. Within weeks of being told this news, however, the Chief had

11  offered jobs to other applicants over him. [Plaintiff Decl. ¶.35] Plaintiff initiated legal action after a total

12  of four U.C. Berkeley Campus police officers were hired during his eligibility over him. [Defendant's

13  Answer to Special Interrogatories Two,Page2Line19/Exhibit 1 to Gustafson Depo.]

14    Finally, after Plaintiff overcame nearly every obstacle Defendant threw at him, Defendant has sought

15  to destroy Plaintiff's reputation as a result of this legal action. They have fabricated provocative

16  "incidents," relied solely on the unfounded, clearly false opinions of those central to denying Plaintiff

    reinstatement, and openly disregarded a massive amount of evidence proving Plaintiff's good moral

17  character and high work ethic.

18    Defendant's unjust treatment has caused Plaintiff years of emotional hardship, a significant loss of

19  status in front of his friends and former colleagues, extended family and his own small children--whom

20  have no ability to understand why he cannot return to his former job even though he is healed. [Plaintiff

21  Decl.¶41] The confusion and pain has caused significant stress-related health problems, reduced earning

22  potential and economic harm - not to mention the many thousands of dollars Plaintiff has spent in legal

23  costs, training costs, and medical costs while he jumped through every procedural hoop Defendant threw

24  at him designed to break him down, humiliate him, and make him give up.

25    So greatly does the Defendant fear the consequences of reinstating even **one** medically retired police

26  officer, it will go to any and all lengths to prevent it. It will not only rig the system to prevent that from

    happening. It will recklessly and aggressively destroy anyone's reputation who tries.

27

28

III.    **LEGAL ARGUMENT**

A.  **SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE DEFENDANT FAILS TO MEET ITS BURDEN**

1.  **Law Regarding Summary Judgment**

Defendant is not entitled to Summary Judgment on any of the issues presented. Summary judgment is appropriate only when the moving party affirmatively establishes that there is no genuine issue of material fact. (*Celotex Corp. v. Catrett*, (1986) 477 U.S. 317, 323). Summary judgment is a drastic device cutting off a party's right to present a case to the jury. Therefore, the moving party bears a heavy burden of demonstrating the total absence of any triable material fact. (*Nationwide Life Is. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F3d 157, 160 (2nd Cir. 1999); *Celotex Corp.* at 323). There must not be a genuine dispute about a material fact such that a reasonable jury could not return a verdict for the nonmoving party, and all reasonable inferences must be drawn in the opposing party's favor where the underlying facts are disputed are in controversy. (*Id.*). The non-movant's version of any disputed issue of fact is presumed to be correct. (*T.W. Elec. Serv. v. Pacific Elec Contractors Ass'n*, 809 F.2d 626, 630-631 (9th Cir 1987). Defendant must establish beyond controversy every essential element of its claim or defense to warrant judgment in its favor. (*Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). Summary Judgment may only be granted when the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. (*UMG Recordings, Inc. v. Sinnott*, 300 F.Supp.2d 993, 997 (ED Cal 2004).

In the present case, Defendant has not met its burden of establishing there is no genuine issue of material fact, nor has it shown that Plaintiff cannot establish the elements of his case. In fact, Plaintiff produces an enormous array of facts that dispute Defendant's assertions: all of which inherently involve the need for a jury's determination. The evidence is such, with all inferences drawn in Plaintiff's favor that a jury could reasonably find for Plaintiff. Defendant's motion should be denied in its entirety.

2.  **Defendant's Distortion Of Facts And Attempt To Hide Triable Issues Of Material Facts Are Grounds Alone To Deny Motion**

In the present case, Defendant either deliberately ignores the law requiring a Motion for Summary Judgment to include only those facts which are truly material to the claims or defenses involved be alleged, or there is a true disconnect between Defendant's interpretation of the law and what it requires. The complete and utter inappropriateness of the declared facts in Defendant's Motion for Summary Judgment is not even the most troubling aspect of its Motion. Indeed, the most troubling aspect is the

1  misleading picture Defendant's motion presents. An article coauthored by a prominent Superior Court

2  judge has pointed out "fatal errors and other problems the court has encountered" in connection with

3  summary judgment motions. At the very top of these errors are motions that "attempt to 'hide' triable

4  issues of material fact. (Brenner & March, *Use and Abuse of MSJs: A View from the Bench* (2007) 49

5  Orange County Law 34, 37.) As the Court in *Nazir v. United Airlines* (2009) 178 Cal.App.4th 243, states,

6  "The article admonishes that a motion 'should never cite evidence out of context in an effort to conceal a

7  clearly triable issue of material fact.'" Disputes as to an employer's motives or state of mind raise

   factual issues, precluding summary judgment. (*Sischo-Nownejad v. Merced Comm. College Dist.*, 934

8  F.2d 1104, 1111 (9th Cir. 1991). Where the inference to be drawn requires that of human experience, the

9  jury must make that determination and summary judgment is improper. (*Nunez v. Superior Oil Co.*, 572

10 F.2d 1119, 1126 (5th Cir 1978). A defendant's falsity of explanation can create an inference of

11 discrimination itself. (*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

12              **i. Defendant Grossly Distorts Plaintiff's Employment History**

13         Defendant entirely disregards the lengthy history of documented praises of Plaintiff's former co-

14 workers, supervisors, and members of the public and has engaged in an outright smear campaign against

15 Plaintiff. Defendant's declarations are misleading, false and firmly disputed. Defendant's suspiciously

16 narrow and unrepresentative statements run entirely contrary to Plaintiff's well-documented, outstanding

17 performance record, and therefore, can only have been made with discriminatory intent. The following

   excerpt from among Plaintiff's numerous declarations, clearly dispute Defendant's allegations:

18         "It is my **firm opinion that he adhered to the high standards** of the Berkeley Police

19 Department...I found him to be a **consummate professional**, courteous to citizens, fellow officers,

20 and supervisors. I personally observed his good judgment under stressful conditions, a **high sense**

21 **of integrity, ethics, and professionalism**, appearance and demeanor," states Plaintiff's former

22 commander, retired thirty year police officer, Lieutenant Russell Lopes. [ Russell Lopes Decl.¶4] "I

23 know him to have been an honorable, hard-working police officer who was **well-liked by his peers**

24 **and supervisors, regularly commended for his outstanding police work**, regularly given coveted

   Special Assignments because of his ability and reputation, and that in my opinion, there was

25 **nothing in either his background, or work history that would make him anything but a**

26 **valuable asset** to the Berkeley Police Department," states command officer Lieutenant Dave

27 Frankel. [Frankel Decl.¶2]

28         Plaintiff's declarations, unlike Defendant's, are ALL supported by an overwhelming volume of

documents. Some of the supporting documents are as follows: Numerous Personal Appraisal Reports (PAR), written by his supervisors during his years of service, demonstrate that Plaintiff was continually recognized for his professionalism, team work, and positive attitude and was never once advised that he needed improvement in his attitude or judgment. Plaintiff's 1996 PAR states Plaintiff met or exceeds all requirements. [PDF Exhibit 11] "I have come to know Officer Gardner as a professional with enthusiasm for the job and community he serves." [PDF Exhibit 10] Plaintiff's 1999 PAR states Plaintiff **exceeds requirements** in the "**maintains harmonious relationships and demonstrates sensitivity to views and feelings of others.**" [PDF Exhibit12] "Officer Gardner is **well liked by his fellow officers and interacts well with citizens** and members of other agencies as well. He presents a professional appearance which reflects well on the Berkeley Police Department." [PDF Exhibit 12] Plaintiff's final supervisor in Drug Task Force stated he **exceeded requirements** in the '**maintains harmonious relationships and demonstrates sensitivity to views and feeling of others'**" and included the narrative assessment, "Officer Gardner is the **consummate team player.**" [PDF Exhibit 13]

Plaintiff's numerous commendations and special assignments verify the reliability of his many declarants and these PAR's. In 1998, a citizen wrote, "Your patience with all the kids, big and small, for the day was above and beyond the call of duty. [PDF Exhibit 3] In 1996, after a citizen spotted Plaintiff stopping traffic with his police car to help a blind female cross the street safely, Plaintiff was singled out by the police department in a written commendation "..for doing his part to make us all look better in the eyes of the public. Thanks for a job well done!" [PDF Exhibit 14] Prior to Plaintiff's injury, Doug Hambleton even wrote a lengthy commendation for Plaintiff complementing him for stopping and apprehending suspects in a violent armed robbery series. [PDF Exhibit 15]

Plaintiff's former field training officer, Sergeant David Elliot, in 1998 states, "In my twenty-eight years with the Berkeley Police Department **I have had the opportunity to see lots of new officers come on board. I have no hesitation when I say that Tim easily stands out among all of them. He is very intelligent and mature. He is a pleasure to work with and presents himself professionally and compassionately at all times to both the public and co-workers alike.**" [PDF Exhibit 1]

Balancing out Plaintiff's reliable declarations, are also the equally high opinions of Plaintiff among his current colleagues, an important job history consideration that Defendant willfully ignored in their recent "evaluation" of his qualifications. "Tim has a **highly developed sense of professionalism. He is courteous and treats other employees/personnel in the office with respect**….I have never seen him disparage a co-worker, supervisor or member of the public." [Senior Deputy Public Defender Kimberly

1  Fitzgerald Decl.¶2]

2      Competent and specific testimony by a single declarant may create a triable issue as to a material

3  fact although opposed by many other declarations to the contrary. (*United States v. One Parcel of Real*

4  *Property*, 904 F2d 487, 491-92 (9th Cir. 1990). In the present case, Plaintiff's numerous, reliable

5  declarations completely defeat Defendant's false representations clearly creating triable issues.

6  Defendant's false explanations and declarations create an inference of discrimination itself.

### ii. Defendant's Assertion That Plaintiff Was Denied Rehire Due To One Sustained Complaint Is Pretext and a Deliberate Attempt To Hide Triable Issues

7
8
9      Chief Hambleton presently claims he was not interested in hiring Plaintiff because of a single

10 sustained complaint Plaintiff received for excessive force. [Hambleton Depo.Conf.Page.104Line18]

11 This is clearly a pretextual reason for non-selecting Plaintiff. First, the officer who shared the complaint

12 with Plaintiff was quickly given a Special Assignment and subsequently promoted to Sergeant.

13 [Hambleton Depo.Conf.Page24Line12] Second, receiving complaints is common and no bar to

14 employee promotions. Lieutenant Frankel declares that multiple complaints, including sustained

15 complaints and being on the Early Warning System, was **no bar** to further special assignments or

16 promotion. [Frankel Decl.¶12,13] Sergeant Reece declares that many Drug Task Force officers who

   have received complaints have been given special assignments and promotions. [Reece Decl.¶4]

### iii. Defendant's Characterization of Plaintiff's Multiple Complaints Is A Gross Misstatement of Fact and An Attempt to Hide Triable Issues

17
18
19     Defendant's listing of Plaintiff's entire complaint history is not only irrelevant, overly

20 prejudicial, but also is deliberatively misleading. First, the majority of complaints against Plaintiff were

21 deemed "unfounded" or "not sustained." Second, the context within which Defendant's portrays the

22 complaints is outlandish and distorted. Many of the complaints named Plaintiff *merely* for being present

23 at the scene; [Plaintiff Decl.¶9] Of the four sustained complaints over Plaintiff's five years of service,

24 involving thousands of detentions and arrests, one was for Plaintiff and his Drug Task Force Partner

25 merely forgetting to generate a computer notation for a detention that didn't result in an arrest. The other

26 two were for **minor** solo patrol car mishaps, resulting in very slight damage to his vehicle. Defendant

27 recklessly places Plaintiff's confidential police officer "complaint file" completely out of context in yet

28 another attempt to mislead the court. The majority of the complaints Plaintiff received were while

   operating as part of an *entire team*, in the most *high-profile* Special Assignment in the police department

commonly known to generate an excessively high volume of complaints [Frankel Decl.¶12] [Lopes Decl.¶8] made by careers criminals to deter further police investigations of their activities.[Libed Decl.¶4] More troubling of Defendant's tactics, is that Defendant ignores the established fact that complaints are **no bar** promotion or re-hire of Berkeley Officers. [Frankel Decl.¶12,13][Reece Decl.¶4]

### 3. Defendant's Assertion That Plaintiff Failed To Disclose A Diversion On His Original Application For Hire Is An Attempt to Hide Triable Issues

Defendant claims in its Statement of Facts that Plaintiff failed to disclose a previously diverted arrest on his initial application to Berkeley P.D. Although Defendant clearly presents this non-relevant, non-probative but highly prejudicial information to the court to further vilify Plaintiff – in the interest of bringing accurate context to Defendant's fabricated detail, Plaintiff describes the circumstances regarding this matter. Defendant knows, and yet deliberately ignores, the absolute fact that Plaintiff's original application to the city of Berkeley states in clear language that an applicant is NOT to divulge an arrest that had been successfully diverted. Defendant's eagerness to present extraneous and unfounded information to the court, demonstrates the lengths it will go to distract from real issues and demonstrates an inference of discrimination itself.

### B. TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S FIRST CAUSE OF ACTION FOR DISABILITY DISCRIMINATION - DISPARATE TREATMENT

#### 1. Defendant's Claimed Legitimate Business Interests Are A Pretext For Discrimination And Are Not Supported By Evidence

California Government Code § 12940 et seq., prohibits an employer from discriminating on the basis of a disability. Defendant admits for purposes of the Summary Judgment Motion that Plaintiff does make a *prima facie* case with respect to his disability and/or perceived disability discrimination. [MSJ, Page15, Line.5] Defendant claims it does so in order to bring attention to the "overwhelming evidence of legitimate, nondiscriminatory business reasons for the City's actions." [MSJ, Page.15,Line7]

Current Berkeley Command Officer, Lieutenant Dave Frankel's testimony alone, is enough to demonstrate a triable issue of material fact. He states Chief Hambleton implied to him, **"Tim was not suitable for re-employment because he went out on an injury."** [Frankel Depo.110Line11] Frankel testifies that **"It's the chief's decision whether or not to hire him. He makes that decision. He chose not to hire Tim."** [Frankel Depo.Page77-78] Given Frankel's significant personal knowledge of Plaintiff's outstanding work record and character, Frankel states that **Plaintiff's injury is "the only**

thing that I know of as to why the chief would not hire him." [Frankel Depo.Page78Line12][Frankel Decl.¶2] Frankel also states that "workplace injuries and medical retirements have frequently not been looked at positively by the Berkeley Police Department," and he has "heard a current command officer make disparaging comments regarding disability retirements." [Frankel Decl.¶2,4]

Defendant's proffered declarations are unfounded and nullified by Plaintiff's definitive work record. They all had a substantial bias against medical retirements. They had **zero to minimal** personal work experience with Plaintiff and never supervised Plaintiff. [Plaintiff Decl.¶15-19]

### i.   Evidence That Defendant's Decision Was Motivated By Discrimination

Plaintiff's shows pretext for discrimination by offering direct or circumstantial evidence that Defendant's decision was likely motivated by discrimination and its explanation is not credible. Defendant's disparate treatment toward medical retirees is definitively shown by statistics. There has **never** been a medically retired Berkeley Officer who has been rehired. Human Resources Manager, Dave Hodgkins, Chief Hambleton and Lieutenant Dave Frankel, all state to their own knowledge that none have ever been reexamined or rehired. [Hambleton Depo.Page158Line9] [Frankel Depo.Page.95Line8]

Approximately 20 percent of all Berkeley P.D. retirees are medical. Of those who have requested reinstatement, none have been reinstated or reexamined. [Frankel Decl.¶5][Plaintiff Decl.¶40] Of the 100 officers retiring since 2000, approximately 20 service retirees (non-medical) have been allowed re-employment with Berkeley in some capacity. The vast number of those who left the department with a non-medical resignation, were upon their request, reinstated or rehired, [Plaintiff Decl.¶40] and given a chance to address any concerns about reinstatement [Frankel Decl.¶15]

Evidence of discriminatory intent is also shown by Defendant requiring medically retired officers who the *department* deems are ineligible for further employment, to sign letters of "resignations." [Plaintiff Decl.¶22][Knowlton Decl.¶1] Even more egregious, is the **requirement** that **injured officers sign a contract** with Defendant in exchange for a disability pension **agreeing that they will never apply for employment** with Defendant again. [McCann Decl.¶6]

Human Resources Director Dave Hodgkins, disregarded Government Code § 21192 related to Plaintiff's request for reexamination, reinstatement, accommodation, and good faith interactive process. Although aware of the Code, as cited by Plaintiff in his many letters requesting reexamination, Hodgkins told Chief Hambleton they were not going to honor the relevant Government Code and instead would do nothing about it. [Hambleton Depo.Page109Line3]

1       In a nearly exact fact pattern to the present case, former standout Dispatch Supervisor Cheryl

2   Lindenau was injured and subsequently resigned from the police Department. She was told by

3   Captain Bobby Miller that the City Manager would not rehire her in 2004 because of her earlier

4   injury and surgery. She submitted herself to the competitive exam in 2009 while Sergeant Schofield

5   was the Personnel and Training supervisor. She was not selected, as Chief Hambleton conveniently,

6   and in a near perfect replication of Plaintiff's situation, states, **"I had concerns about her

7   performance and other issues related to her background."** [Hambleton Depo.Conf.157Line7]

8   Lindenau is convinced she was not advanced in the process and other less qualified persons were

    selected over her because Defendant was hostile to her injury. [Cheryl Lindenau Decl.¶4]

9       In violation of the Peace Officers Bill of Rights, and their own departmental policy, Chief

10   Hambleton ordered Plaintiff's internal affairs file preserved indefinitely with the specific intent to use

11   his internal affairs file against in the event Plaintiff pursued legal action to regain his job. [Hambleton

12   Depo.Page118Line10][Plaintiff Decl.¶25][PDF Exhibit 16]

13       Berkeley Police Command Staff, especially Chief Doug Hambleton and Sergeant Schofield, have

14   highly charged, negative opinions about disability retirements. [Plaintiff Decl.¶19] Hambleton "made

15   disparaging remarks about my condition and suggested that my diabetes was not a disabling condition."

16   [McCann Decl.¶3] As stated by Lieutenant Frankel, Plaintiff's chances for coming back to work were

    not good because Hambleton said "that there would be nothing to stop him from coming back, getting

17   re-injured and then going back out on a disability retirement at a higher rate of pay."[Frankel Decl.¶3]

18   Perhaps most indicative of discriminatory intent, is Chief Hambleton's own deposition where he stated

19   that he had continually been concerned about rehiring Plaintiff because of his previous on-duty injury

20   limitations. [Hambleton Depo.Page.175Line9]

21       Further disparate treatment is demonstrated by the fact that Plaintiff was not allowed an opportunity

22   to address "rumors" and negative comments about him unlike other former Berkeley officers upon their

23   reapplication requests. [Frankel Decl.¶15]

24       Evidence of pretext is clearly indicated when Sergeant Schofield told Plaintiff that the reason

25   Plaintiff wasn't selected was because of a "total hiring freeze," then Defendant turned around and

26   immediately hired several University of California, Berkeley Campus Police laterals. [Defendant's

    Answer to Special Interrogatories]  Schofield has also shifted from his initial rationale for why Plaintiff

27   was not moved forward in the hiring process. His initial claim, to Plaintiff was a "hiring freeze," that no

28   one had been hired from his list, future testing was cancelled. [Plaintiff's Decl.¶35] Now, declarant

Schofield claims Plaintiff was not selected because of his work performance. Shifting rationales alone discredit declarant.

ii.     Evidence that Defendant's Proffered Explanations and Declarations Are Not Credible

Defendant's proffered declarations, made by persons with a vested interest in the outcome of these proceedings, and with little or no personal knowledge of plaintiff's work history, but with a known hostility to disability retirements, and specific knowledge of Plaintiff's disability, [Plaintiff Dec.¶15-19] are unreliable and not credible.

Plaintiff, in an effort to clear his good name, that continues to be damaged by Defendant's hostility to his injury, offers the true and accurate portrayal of his outstanding work history and reputation. The following is the evidence that should have been considered by those deciding to rehire Plaintiff had the process been fair and impartial. "I found him to be a **consummate professional**, courteous to citizens, fellow officers, and supervisors. [Lopes Decl.¶4] **"Tim easily stands out among all of them. He is very intelligent and mature. He is a pleasure to work with and presents himself professionally and compassionately at all times to both the public and co-workers alike."** [PDF Exhibit 1]

Tim had a **"high work ethic and his good reputation…was well liked…courteous to other officers…," "he was not, nor did he have the reputation for being, insubordinate** to his superiors or others." [Sergeant Dave Lindenau Decl.¶3] "I had the chance to **work with Tim for several years** and knew him to be an outstanding officer with a **good attitude** and, as an officer a couple of years junior to him, I **never felt that he disparaged or demeaned me, or was rude to me or any other junior officers**. He was very respectful, professional, and had a high work ethic." [McCann Decl.¶10]

"Tim demonstrated **considerable professionalism**, a high work ethic…possessed sound judgment….was **well liked**…treated others with respect, including citizens, fellow officers, supervisors, and those officers junior to him. [Libed Decl.¶3] "I know him to have been an honorable, hard-working police officer who was **well-liked by his peers and supervisors, regularly commended for his outstanding police work…"** [Frankel Decl. ¶2]

Plaintiff's declaration statements are ALL firmly supported by his documented Personal Appraisal Reviews (PAR) discussed previously and incorporated herein. [PDF Exhibit 4,10-13] Plaintiff's Performance Appraisal Reports where supervisors who had supervised him under nearly every circumstance, consistently complemented Plaintiff on his outstanding performance.

Defendant alleges Chief Hambleton played "no role in the decision to drop Plaintiff from

consideration." [MSJ Page25] This is firmly disputed. Captain Gustafson testified Morizano alerted him, and he alerted Chief Hambleton to the impending decision not to advance Plaintiff. But he conveniently does not remember what Hambleton's response was. [Gustafson DepoPage.32-34] Chief Hambleton testified that he spoke with both Gustafson and Human Resource Director Hodgkins about Plaintiff's eligibility. [Hambleton Depo.Page110Line13] Chief Hambleton in his own deposition, stated that he had continually been concerned about rehiring Plaintiff because of his previous on-duty injury limitations. [Hambleton Depo.Page.175Line9] It is firmly disputed that this "chain of command" notification and discussion somehow did not result in either tacit approval or direct involvement of the decision to not advance Plaintiff. [Plaintiff Decl. ¶39] Defendant also alleges that the decision makers had "no knowledge" of Plaintiff's injury. [MSJ Page 25] This is firmly disputed. Plaintiff had multiple conversation with the decision makers, post retirement, about his disability and was made aware of at least one of their negative comments about his rehabilitation, [Plaintiff Decl.¶15,16,19] and Schofield himself admits in his declaration he knew about Plaintiff's rehabilitation [Scholfield Decl. ¶7]

### 2. Defendant's Falsity Of Explanation And Shifting Rationales For Not ReHiring Plaintiff Create An Inference Of Discrimination

A defendant's falsity of explanation can create an inference of discrimination itself. (*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). The falsity in Defendant's declarations create an inference of discrimination itself. Nowhere in the record are Defendant's declaration statements supported by evidence. Defendant's shifting explanations create an inference of discrimination itself. Defendant has thus far used the following shifting explanations in supporting its decision to not rehire Plaintiff: 1) The chief had no role in the hiring process, 2) Plaintiff was no longer eligible per two year eligibility date, 3) Plaintiff just wanting to return for the money, 4) Command staff hadn't heard about his application, 5) had a hiring freeze, 6) took other qualified candidates, 7) Plaintiff's poor work performance and bad reputation, 8) another hiring freeze, [Plaintiff's Decl.¶29] 9) no hires were made from his list, 10) he was not ranked at the top of that list, 11) no longer had reinstatement rights, 12) severe budgetary problems.[Defendant's Answers To Special Interrogatories, Set One,Page2] Shifting rationales create a reasonable inference of discrimination itself.

### 3. Insidious Language Used By Defendant Establish Facts By Which A Jury Could Find Discrimination

Defendant's constant use of loaded and false terms to describe Plaintiff's prior work history and reputation imply animus towards his injury and disability and others who have been injured or disabled.

The court found in *Aman v. Cort Furniture Rental Corp.*,(1996) 85 F.3d 1074, 1083, that through the use of discriminatory language, a jury could conclude discrimination is implicit in one's comments. The court found, "the words themselves are only relevant for what they reveal – the intent of the speaker."

In the present case, Defendant's principal declarant, Sergeant Kevin Schofield, who allegedly had a prominent role in denying Plaintiff's re-employment, and who was himself the subject of several of the personnel complaints Defendant paints Plaintiff so broadly with [Plaintiff Dec. Para 19], falsely states, that Plaintiff was "a real problem in the department;" a "malcontent;" a "known entity" and it would be a "big mistake to bring him back." He had "zero inclination of moving him forward." [Schofield Decl.¶5] He refused to share this "opinion" with Plaintiff during several initial communications about the hiring process. Instead, he insisted that Plaintiff fill out massive amounts of personal history paperwork in order to cover himself when he later claimed "legitimate business reasons." This insidious covert operation, when taken together with Defendant's negative opinions of medical retirees, [Frankel Decl.¶15] [Plaintiff Decl.¶19] and disparate treatment towards other former non-injured Officers who were welcomed back to the department, all establish facts by which a jury could easily find pretext and discrimination.

## C. TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S SECOND CAUSE OF ACTION FOR DISABILITY DISCRIMINATION - REASONABLE ACCOMODATION

### 1. FEHA's Accommodations Requirements Were Violated By Defendant

The FEHA prohibits as an unlawful employment practice, for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee" unless the accommodation would cause "undue hardship" to the employer. (Government Code § 12940, subd. (m); *Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1383)

"The goals of human resource practices in making reasonable accommodations for injured/disabled employees is for an employer to retain injured employees, who can successfully complete essential job functions. This is especially important where there is substantial investment in an employee through training and experience, such as was the case with Plaintiff. These accommodations should represent a good faith effort of employers and employees working together to modify, alter or restate work to permit the employee to continue working." [Plaintiff Expert Report, Schmidtke Page22]

Not only was there no accommodation for Plaintiff at the time he accepted his medical retirement [Plaintiff Depo.Page109Line4] but there has been no accommodation throughout his efforts at

1  reinstatement or rehire. Defendant argues they had no duty to accommodate Plaintiff because he was

2  never reinstated. Defendant completely misses the mark and this is firmly disputed. Defendant is acting

3  as though Plaintiff was not a "de facto" employee, ready for reinstatement, even required by law to

4  submit himself to re-examination if asked by Defendant. Plaintiff was not some "outsider" to whom no

5  duty was owed until he was "hired." Once Plaintiff asked for reinstatement, Defendant then had the

6  immediate duty to engage in a dialogue or an exchange, and reexamine Plaintiff to make sure he could

7  perform the essential job functions. (Government Code § 21192)

   By 2003, Plaintiff had already gone through the entire process of getting an independent evaluation

8  at his own expense to determine if he could perform the duties of a police officer. [Lacalle Decl.¶3] Yet,

9  Defendant ignored Plaintiff's evidence and requests, and even castigates Plaintiff in the MSJ for having

10 the audacity to follow defendant's original direction for him to request reinstatement in 2002 by

11 contacting Human Resources, before he had been cleared for duty. [MSJ Page 5] Defendant's conduct

12 falls far short of the standards for a reasonable accommodation of accepted human resource practice.

13 [Plaintiff Expert Report, Schmidtke Page22]

14 **D.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S THIRD
        CAUSE OF ACTION FOR DISABILITY DISCRIMINATION - FAILURE TO
15      ENGAGE IN INTERACTIVE PROCESS**

16    Defendant failed to engage in any type of interaction with Plaintiff at the time Plaintiff accepted his

17 medical retirement in 2001. Then-Administrative Captain Hambleton, called Plaintiff into his office and

18 told him the City was going to retire him. [Gardner Depo.Page.108Line8-10] When Plaintiff questioned

19 this, Hambleton responded that his doctor put limitations on his work that the department wouldn't

20 accept [Gardner Depo.Page108Line13-15] There was no interactive discussion as to whether

21 accommodations could be made or whether Plaintiff would be expected to recover from his injuries.

22    There were multiple requests made by Plaintiff between 2002 and 2009 [PDF Exhibits 6,7,8,9,17-

23 23] to engage in a discussion about how he might return to work yet there was zero willingness to

   discuss this with Plaintiff. Human Resource Director Dave Hodgkins received Plaintiff's requests but

24 did nothing. [Hodgkins Depo.Page.30-32]  Chief Hambleton discussed his requests with Hodgkins

25 whereby Hodgkins specifically said he would do nothing in response to Plaintiff's request to follow

26 Government Code §21192. [Hambleton Depo.Page.109Line3] Defendant had no interest in engaging in

27 the process required of them.

28

**E.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S FOURTH CAUSE OF ACTION FOR DISABILITY DISCRIMINATION – RETALIATION**

Plaintiff must show that he engaged in protected activity and was thereafter subjected to adverse employment action by Defendant because of that protected activity. (*Morgan v. Regents of the University of California* (2000) 88 Cal.App.4th 52, 69.) Where an employer retaliates by denying prospects for advancement, or promotions, or reinstatements because an employee takes action on a protected activity, the employer has engaged in an adverse employment action in violation of FEHA. (Gov. Code, § 12940, subd. (h); *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1055 (*Yanowitz*); *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 895-896.)

In the present case, Plaintiff's protected activity was receiving a medical retirement for an injury sustained in the line of duty. Since becoming medically retired, indeed even prior to, Defendant has embarked on an unmitigated smear campaign alleging the most malevolent motives for Plaintiff and his attempts at reinstatement. The ultimate act of Defendant's retaliation has been to use the strategy above as a pretext to deny Plaintiff fair and equal treatment.

**F.  TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S FIFTH CAUSE OF ACTION FOR DISABILITY DISCRIMINATION – HARASSMENT**

    **1.  Law On Continuing Violations Doctrine**

One approach to the continuing violation doctrine is derived from the doctrine of equitable tolling. This approach has been expressed in *Moskowitz v. Trustees of Purdue University* (7th Cir. 1993) 5 F.3d 279: "Under the doctrine of equitable tolling, . . If it is only with the benefit of hindsight, after a series of discriminatory acts, that the [employee] can realize that he is indeed a victim of unlawful discrimination, he can sue in regard to all of the acts provided he sues promptly after learning their character, even if the statute of limitations has run on all of them. Another approach is in *Berry v. Board of Sup's of L.S.U.* (5th Cir. 1983) 715 F.2d 971, which has been widely adopted by the federal courts. (*Filipovic v. K&R Exp. System Inc.* (7th Cir. 1999) 176 F.3d 390, 396; *Sabree v. United Broth. of Carpenters & Joiners* (1st Cir. 1990) 921 F.2d 396, 402. In the area of reasonable accommodation for disability, some courts applying the *Berry* test have found a continuing violation based primarily on the factors of similarity of subject matter and frequency of misconduct, deemphasizing the permanence factor. In *Lewis v. Board of Trustees of Alabama State University* (M.D.Ala. 1995) 874 F.Supp. 1299, 1304, an employee had made repeated requests, repeatedly refused, for a transfer to accommodate her disability. The court determined the

1  complaint contained sufficient allegations of an ongoing practice of discrimination. The court did

2  not consider the permanence factor. Another approach has dispensed with the permanence factor

3  altogether and has adopted what may be termed a "course of conduct" test rather than the *Berry* test,

4  as was recognized in *Counts v. Reno* (D.Hawaii 1996) 949 F.Supp. 1478, 1484-1486. The test

5  employed is whether the separate acts of discrimination are "'closely enough related' " to form a

6  continuing violation. (*Id.* at p. 1485; see also *Fielder v. UAL Corp.* (9th Cir. 2000) 218 F.3d 973,

7  987-988.) If the employer has made clear in word and deed that the employee's attempted further

8  reasonable accommodation is futile, then the employee is on notice that litigation, not informal

   conciliation, is the only alternative for the vindication of his rights.

9      In *Richards v. CH2M, Inc.* (2001) 111 Cal.Rptr.2d 87, 26 Cal.4th 789, the court adopted a

10  modified version of the *Berry* test. As in *Berry*, the court held that an employer's persistent failure

11  to reasonably accommodate a disability, or to eliminate a hostile environment, is a continuing

12  violation if the employer's unlawful actions are sufficiently similar in kind, have occurred with

13  reasonable frequency, and have not acquired a degree of permanence. That court further held, that

14  "permanence" in the context of a process of accommodation of disability, or ongoing disability

15  harassment, should be understood to mean that an employer's statements and actions make clear to

16  a reasonable employee that any further efforts at conciliation to obtain reasonable accommodation

17  or end harassment will be futile.

18          2. **Plaintiff's Claims Fall Under The Continuing Violations Doctrine**

19      In the present case, Plaintiff was never put on notice that litigation, not conciliation, was the only

20  alternative for the vindication of his rights. Although Plaintiff anticipates that Defendant will claim

21  Plaintiff's filed 2003 Writ demonstrates a "permanence" to his reinstatement prospects, Defendant's

22  argument would be incorrect for two reasons: first, the 2004 Writ order placed no "permanence" on

23  Plaintiff's "right" to his reinstatement. The Writ Order merely stated Plaintiff "cited no authority" for

24  the court to order his reinstatement [PDF Exhibit 24] and never addressed any right or requirement of re-

25  examination; second, and more compelling is that in 2006, Sergeant, now-Lieutenant Dave Frankel re-

26  contacted Plaintiff and informed him there were multiple open police officer positions and also a new

27  chief of police who may be more receptive to Plaintiff's reinstatement. [Plaintiff Decl.¶28] Frankel then

28  offered to "put the feelers out" to see if Plaintiff could get re-hired. [Plaintiff Dec. Para 28] [Frankel

   Depo.Page.37Line1-28] [Gustafson Depo.Page.63-64] Although the offer was met by the comment that

Plaintiff was "not well-liked by the black command staff," the information also suggested to Plaintiff that should the command staff change, Plaintiff might be given other opportunities to be reinstated and in no way ever indicted any "permanence" to Defendant's previous resistance to reinstatement. Using the Berry test, the facts in Plaintiff's case demonstrate an ongoing practice of discrimination for failure to reasonably accommodate and continued harassment sufficient to fall under the Continuing Violations Doctrine.

Plaintiff made repeated requests in 2007 [PDF Exhibit 8, 17-23] for accommodation, re-examination and reinstatement and Defendant never made clear to Plaintiff that any further efforts on Plaintiff's part to obtain reasonable accommodation or end his harassment would be futile. In fact, Defendant said the opposite. Defendant told Plaintiff that even though he was a medical retiree, he had to apply for hire as a new recruit, thus implying that Defendant would then reasonably accommodate Plaintiff under this alternative path to re-employment. [PDF Exhibit 8] Plaintiff, confused by Defendant's suggestion, and of the mind that this was further harassment, asked Defendant in another letter dated September 21, 2007 why and how he was to apply as a new recruit when he had worked for the department that itself had placed Plaintiff on a medical retirement disability status. [PDF Exhibit 22] Plaintiff had been well aware of the Government Code and CALPERS' reinstatement policy both of which dictated a different approach. [PDF Exhibit 25,26] Defendant received no response to his inquiry and on July 26, 2008, Plaintiff again contacted Defendant complaining that he had received no response to his previous query and again asking for some good faith process. [PDF Exhibit 23] Defendant responded on August 11, 2008, disregarding Plaintiff's earlier request for clarification and instead stated that they weren't taking any further action on his request for reinstatement. However, Defendant clearly had left the door open to their earlier suggestion for Plaintiff to apply as a new recruit. [PDF Exhibit 9] Since that offer was a direct result of Plaintiff's earlier request for accommodation, Defendant's offer was made pretextual in the same manner as their first success at having himself place himself on an eligibility list. They clearly advertised it to Plaintiff as an "alternative path" to employment, implying that they would accommodate or engage in a good faith interactive process if Plaintiff played by their "rules." Plaintiff relied on this and did not yet expect litigation was the only alternative. Instead Plaintiff, at his earliest opportunity enrolled and paid for a required recertification police academy. Upon completion, he immediately applied in 2009 to the department as a lateral officer. In that application, Plaintiff clearly described his medical retirement and possible need for accommodation. When the hiring

1   process was complete in 2010, although Plaintiff scored as the "Best Qualified" candidate [PDF 30],

2   neither his request for accommodation nor his re-employment was granted. To the contrary, Defendant's

3   prior harassment, refusal to accommodate, reexamine, reinstate, castigation of Plaintiff's character, all

4   accelerated - leading to Plaintiff's realization that no matter he did to gain "eligibility," litigation was the

5   only vindication of his rights. Plaintiff filed his DFEH complaint in 2010. Defendant's actions are not

6   "discrete acts." It didn't make a one-time decision to not rehire Plaintiff. Defendant instead, provide bad

7   faith employment "leads" meant to further humiliate and harass him. The hostility toward Plaintiff, and

8   others similarly situated, was pervasive, regular and spanned nearly a decade, involving numerous

9   strategies to damage his reputation in a mean-spirited effort to punish and humiliate Plaintiff, and

10  prevent him, and others, from returning.

### G. MEDICAL RETIREES HAVE A CONTINUING EMPLOYEE/EMPLOYER RELATIONSHIP AND ONGOING REINSTATEMENT RIGHTS

#### 1. BPD'S Memorandum Of Understanding "MOU" Is Pretextual When Applied To Medical Retirees

One of Defendant's many "shifting" rationales for not reinstating Plaintiff is the claim that his

"reinstatement eligibility" expired two years after he left the department on his medical retirement.

Therefore, they had no duty to "reinstate" him. Though Human Resource Director Doug Hodgkins

couldn't remember whether it was "two or three" years and although he really didn't know if a policy

existed, or what it said if it did exist, he nevertheless claimed Plaintiff's reinstatement eligibility expired.

[PDF Exhibit 8][Plaintiff's Expert Report, Schmidtke Page17]

Hodgkins is clearly referring to the City of Berkeley's Memorandum of Understanding (MOU),

which is the employment agreement between the City and Berkeley Police Association (BPA). In that

Agreement, §39 allows former officers who "resigned" to be reinstated if they re-apply within 2 years.

However, §39 was never intended for medical retirees. According to Randolph Files, former BPA

president, who had negotiated §39, states that §39 was specifically created for those officers who

"resigned" and not medical retirees. [PDF Exhibit 27,¶9-11]

Because the two year statute of limitations period claimed by Defendant does not apply to Plaintiff.

Plaintiff, by virtue of his medical retirement, and ongoing relationship with the police department

through his pension, their authority to grant him concealed weapons permit and a Berkeley Police

Department Retirement identification, that he must continually be recertified and appear at the

department for, and their authority to compel him to submit himself to a re-examination of his disability under the Government Code, which Human Resources Director Hodgkins himself admits would control (if he knew about it), does not have a clear statute of limitation date for which to obtain a reinstatement.

Plaintiff's Human Resource Expert, sees "no organizational basis as to why there is a limited time period...putting a time limit on reinstatement places an unnecessary hurdle on disabled employees trying to return to work after an injury." [Plaintiff Expert Report, Schmidtke Page18]

## 2. Government Code Supports Ongoing Reinstatement Rights

Government Code § 21192 supports an ongoing relationship between a local safety agency and a public safety disability retiree. It states, in pertinent part, that the employer from whose employment the person was retired, upon an employee's request for reinstatement, "***shall*** cause a medical examination to be made of the recipient..." to determine if the medical retiree is capable of doing the job functions. The law requiring **mandatory** reexaminations upon retiree's request for reinstatement, clearly considers the disability retirement itself as a temporary arrangement and likely to change, depending on the healing process, and anticipates the continuation of the employer/employee relationship.

Further, California Government Code § 21196 states, "The board may reinstate a person from retirement upon (a) his or her application to the board for reinstatement and (b) the determination of the board that his or her age at the date of application for reinstatement is at least six months less than the age of compulsory retirement for service applicable to members..." To further protect the rights of the disabled, California Government Code § 21193 states, "The fact that he or she was retired for disability does not prejudice any right to reinstatement to duty which he or she may claim." California Government Code § 21175 states, "If any recipient of a disability retirement allowance under the minimum age for voluntary retirement for service applicable to members of his or her class refuses to submit to medical examination the pension portions of his or her allowance may be discontinued until his or her withdrawal of the refusal."

Defendant, whether intentionally or negligently, misclassifies all Berkeley Police medical retirees and erroneously lumps them together with those who simply resigned for other purposes.

## 3. CalPERS Supports Ongoing Reinstatement Rights

CalPERS, in their publication for disability retirement application states that if an employee recovers from the injury or illness that resulted in disability or industrial disability retirement wishes return to work for a CalPERS covered employer, he or she must first apply for reinstatement from retirement with the agency who retired him or her. If new medical evidence shows he or she has recovered, he or she

"will be approved for reinstatement from retirement." It is clear that the CalPERS "goal for any city or municipal agency is to reinstate individuals who were on disability retirement if later they were able to return to work." [PDF Exhibits 25,26][Plaintiff's Expert Schmidtke Report Page17] Schmidtke further states, "Clearly BPD's actions are inconsistent with these policy recommendations.  Further it should be noted that this policy is consistent with the policy that was drafted in 2008 while **David Hodgkins was on the executive board** of the **League of California Cities**." [PDF Exhibit 28,Page4] [Plaintiff's Expert Report, Schmidtke Page16] "The League supports:...(d)requiring persons receiving disability retirement payments to obtain an annual medical exam; (g) **requiring mandatory reinstatement for employees certified able to work by medical exam**. [PDF Exhibit 28,Page2,bullet2]

The Director of Human Resources, David Hodgkins, testified in his deposition that if there was a CalPERS written policy that covers reinstatement of disables officers, **"I'm not aware of it."** [Hodgkins Depo.Page.25Line4] But further testified that if CalPERS did have such a policy, Defendant would **have to follow it.** [Hodgkins Depo.Page.25Line5-20] Whether deliberately or ignorantly, Hodgkins disregarded the law and policies, and in so doing discriminated, or failed to prevent, discrimination against Plaintiff.

### 4. Defendant Has A Pattern And Practice Of Disability Discrimination Toward Medically Retired Officers

Evidence of Defendant's harassment and discrimination of Berkeley Police Department's injured officers couldn't be clearer than when reading the declarations of other sworn officers injured on duty. Officer Sean McCann was treated respectfully and professionally and honored with Special Assignments until he developed Type 1 Diabetes. From that time forward, the Command Staff treated him with hostility and resentment over his medical condition. When McCann was deemed eligible for a medical retirement, **Defendant compelled him to sign a contract that, in return for his disability retirement, he would never reapply for employment with the City of Berkeley again, no matter the status of his medical condition in the future.** [McCann Decl.¶6]

Officer Rick Ramos, following his medical retirement, sought reinstatement but was told by Chief Dash Butler that he wasn't interested in reinstating Ramos. Officer Ramos had the clear impression that if he did manage to get reinstated, he would never be promoted and he would suffer significant consequences while working at the department. [McCann Decl.¶.8] [Plaintiff Decl.¶31]

1    Medically retired former Berkeley Police Office Christine Knowlton, as part of receiving her

2  disability retirement, was also **required by the City of Berkeley to sign a document stating that I**

3  **was resigning** from the police department. I was confused by this requirement because I felt my

4  separation from the police department was a medical retirement due to my injury and not a resignation."

5  [Knowlton Decl.¶1]

6    Former Dispatch Supervisor Cheryl Lindenau was injured and subsequently resigned from the police

   Department in 2004 with the promise of being able to return part time. She was subsequently told by

7  Captain Bobby Miller that the City Manager would not rehire her soon thereafter because of her earlier

8  injury and surgery. She submitted herself to a competitive exam in 2009 while Sergeant Schofield was

9  the Personnel and Training supervisor and she was not selected, "because of something in her

10 background," and yet was not informed of such. According to her, she was not advanced in the process

11 and other less qualified persons were selected over her. However she is convinced she was not selected

12 because of the hostility to her on-duty injury. [Cheryl Lindenau Decl.3,4][Hambleton

13 Depo.Page157Line7][Plaintiff Decl.¶32]

14    Currrent Berkeley Police Officer Rich Marin upon his injury, was called at home by a command

15 officer, berated for his injury, told he would never be promoted if he didn't work injured, and was then

16 told by a different command officer that under no circumstances was that particular command officer

   prevented from working by his own line-of-duty injuries. [Plaintiff Decl.¶36]

17    Defendant began harassing Plaintiff soon after his on own duty injury when Sergeant Garrin Neilson

18 called him in 1997 and attempted to persuade him to disregard his Doctor's orders and come into work

19 as "political advice" to save his career [Plaintiff Decl. ¶5] Furthermore, upon Plaintiff's return to work.

20 Lieutenant DeLatour told him that in order to avoid a reputation for malingering and to ensure his

21 popularity with the brass and that he would have a long career, he would need to come into work

22 injured, short "of being in a body cast." [Plaintiff Decl.¶6] Lastly, Sergeant Kerry Kent told Plaintiff,

23 upon Plaintiff informing him his doctor had recommended surgery for his injured shoulder, that "now is

24 not a good time to get injured."  [Plaintiff Decl.¶8] When Plaintiff returned to work, Defendant put

25 Plaintiff on telephone report taking or TRT, which is widely known, by its sheer tedium, as being

26 designed to drive injured employees back out on the street working. [McCann Decl.¶5][Plaintiff

27 Decl.¶.8] Plaintiff returned to full duty, feeling the heavy weight of disapproval from his Command

28 Staff.

---

In December, 2000, then Administrative Captain Hambleton angrily told Plaintiff that the department intended to retire him with his current doctor's report. In December 2001, Hambleton ordered Plaintiff to submit a "letter of resignation" in return for his disability pension payments. In September 2002, after Plaintiff made an application for reinstatement to the police department, the retaliation and harassment started up again. It began with then Chief Roy Meisner falsely informing Plaintiff that reinstatements from a disability retirement were beyond the purview of the Chief and were solely the discretion human resources; thereby, tricking Plaintiff into placing himself on the permissive reinstatement list that was specifically designed for permissive separations, not medical retirees. [PDF Exhibit 6,¶3][Palintiff Decl.¶26]

In October 2002, then-Administrative Captain Doug told now-Lieutenant Dave Frankel that Plaintiff would not be allowed back at Berkeley because he would only be returning for a higher rate of pay and would merely get re-injured and go out on another retirement. [Frankel Depo.Page.77Line12] In November 2002, Chief Roy Meisner and then-Captain Hambleton talked about Plaintiff's reinstatement and about the "rumors" the Plaintiff coming back to work for more money with intention to get reinjured. [Hambleton Depo.Page.123Line.1-25] Because these two decision makes were talking **about** Plaintiff, his reinstatement, and these vicious rumors in a private meeting, the only reasonable inference is that this false information, and their negative opinions about Plaintiff's injuries, played into their decision making while considering Plaintiff's requests for reinstatement.

In February 2003, Personnel and Training Sergeant Kelly Gordon made a blatantly false statement to Plaintiff when she said she was "unaware" Plaintiff was on an eligibility list even though it had already been provided to the department and furthermore, used the pretext reason that there was a hiring freeze and all further testing was cancelled while coldly stating, "now is not a good time to be looking for a job around here. " [PDF Exhibit 7] In 2003, BPA President Randy Files tried to plead Plaintiff's reinstatement with Chief Meisner, to no avail. [PDF Exhibit 27] In August 2006, the command staff expressed negative opinions wholly inconsistent with Plaintiff's record.  [Frankel Decl.¶3] [Frankel Depo.Page.38Line2]

In September 2007, HR Director Dave Hodgkins, tricked Plaintiff into another eligibility list, aware that would be the easiest way to defeat his requests for reinstatement. [PDF Exhibit 8] In August 2008, Chief Hambleton, in agreement with HR Director Dave Hodgkins, refused Plaintiff's requests for accommodation, reexamination, or reinstatement, and instead ordered Plaintiff's IA file preserved forever to help him influence any possible legal action by Plaintiff. [Hambleton Depo.Page.118Line10]

[Exhibit1] These actions together with the refusal to maintain a viable path and fair process to reinstate disabled employees, demonstrates Defendant's bad faith and hostile intent to retaliate and harass medical retirees.

### H. TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S SIXTH CAUSE OF ACTION FOR DISABILITY DISCRIMINATION – FAILURE TO PREVENT DISCRIMINATION

Captain Gustafson failed to prevent discrimination. He admits to there being no standardized procedure in place. He also admits that he, as captain in Plaintiff's hiring process, is the one **ultimately responsible** for **ensuring that the selection process was done fairly**, [Gustafson Depo.Page.39-40] Yet, shockingly, he admits also that he has no idea if the process was fair for Plaintiff. When asked "Do you feel that Tim has been given a fair opportunity to be reinstated at Berkeley?," He responds, "...I don't think I can give you a conclusion on that. I don't know what was reviewed. That's impossible for me to answer."[Gustafson Depo.Page9Line2-placed erroneously by reporter in Confidential Portion]

Captain Gustafson states Lieutenant Morizano and Schofield made the decision to not hire Plaintiff [Gustafson Depo.Page.21Line4) He states that among the many things that should be considered when determining if an applicant is best qualified are: a person's oral board test score, work history, education, information on their application. [Gustafson Depo.Page.39Line25] However, when asked what Morizano and Schofield considered when making their evaluation he responds, "I have no idea what he used as his evaluation criteria." [Gustafson depo.Page.40Line19.] When asked how it was he was sure Morizano and Schofield knew what things to evaluate when considering applicants, Gustafson responds, "I don't know." When asked how they got their training, he responds, "I don't know."[Gustafson Depo.Page.45Line.24,Page.46,Line5] When asked if he himself trained them, he responds, "I don't know. I don't remember." [Gustafson Depo.Page46Line5] Most disturbing is that he feels it acceptable if they chose to not consider Plaintiff's prior work record (outstanding PAR's) or speak to Plaintiff's previous supervisors. "I have no idea who he spoke to..." [Gustafson Depo.Page22Line5]

Gustafson signed off on Morizano and Schofield's decision while admitting he was completely ignorant as to the standards they applied – if any. "The selection system should follow a standardized process to ensure that every applicant is treated consistently and that bias in the process is reduced. Without a clear systematic process, the potential for discrimination becomes greater." [Plaintiff Expert Report, Schmidtke Page20] Clearly, Schofield and Morizano's bias and discrimination crept into

Plaintiff's selection process. Indeed, it need not have "crept" in given Gustafson was so asleep at the wheel – it could have been dropped by a bomb and yet would have still gone unnoticed.

Hodgkins and Hambleton are equally to blame for failing to prevent discrimination. Neither of them were aware of the requirements of the Americans with Disabilities Act. They disregard their obligation to follow the Government Code, CalPERS, and League of Ca. Cities [PDF Exhibit 28] by not having a procedure in place to conduct examinations of medical retirees. Although the mechanism by which a medical retiree can be fairly evaluated and reinstated is clear, Hambleton and Hogkins are either blatantly ignorant of or willfully ignoring it.

## I. TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S SEVENTH CAUSE OF ACTION FOR DISABILITY DISCRIMINATION - VIOLATION OF CIVIL RIGHTS LAWS UNDER 42 U.S.C. § 1983 & § 1985

Defendant intentionally discriminated against and retaliated against Plaintiff because of his disability or perceived disability, the discrimination was done in the performance of Plaintiff's official duties and in violation of Plaintiff's rights. All of which resulted in causing Plaintiff's harm. Plaintiff has met his burden to show Defendant's proffered explanation was a pretext. *Cornwell v. Electra Cent. Credit Union* 439 F.3d 1028 (9th 2006).

## J. TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S EIGHTH CAUSE OF ACTION FOR DISABILITY DISCRIMINATION - VIOLATION OF CALIFORNIA CONSTITUTION ARTICLE I, SECTION 7

In acting in a discriminatory manor and failing to prevent discrimination, as stated above and incorporated herein, Defendant violated Plaintiff's due process and equal protection rights under the California Constitution. Defendant's alleged facts are disputed. As stated above and incorporated herein, Plaintiff has a continuing employer/employee relationship.

## IV. CONCLUSION

For the foregoing reasons, Defendant has failed to affirmatively establish that there are no genuine issues of material fact. There are material facts that are clearly disputed, and which inherently involve a jury's determination. The evidence is such, with all inferences drawn in Plaintiff's favor that a jury could reasonably find for Plaintiff. As such, Defendant's motion should be denied in its entirety.

Dated: November 30, 2011                    Respectfully Submitted,

_____/s/_____
Kacey Gardner
LAW OFFICE OF KACEY GARDNER
Attorney for Plaintiff TIM GARDNER