EDWARD W. BURNS                 SBN 201913
MELISSA L. RODRIGUEZ            SBN 201733
BURNS, SCHALDENBRAND & RODRIGUEZ
EWBurns@bsrlawyers.com
1155 Sportfisher Dr., Suite 120
Oceanside, CA 92045
TEL:  (760) 453-2189
FAX:  (760) 453-2194

Attorneys for Plaintiff,
TIMOTHY GARDNER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY GARDNER,<br><br>                    Plaintiff,<br><br>          vs.<br><br>CITY OF BERKELEY, and DOES 1 through 50.<br><br>                    Defendants. | **NO.  C10-03410 EMC**<br><br>**DECLARATION OF DR. JAMES M. SCHMIDTKE IN SUPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |

I, James M. Schmidtke, declare:

    **A.**                **Background, Training, Education and Experience**

    1.   I am currently a professor at the Sid Craig School of Business Management Department at California State University Fresno.  I have been a professor, assistant professor, associate professor and instructor at California State University Fresno 2001.

    2.   My teaching interests include organizational behavior, human resource management (both general and specialized courses), and negotiation/conflict management.  I am interested in continuing to teach at all levels including undergraduate, graduate (MBA), and executive education.

    **i.**      **Education**

    3.   I received my Ph.D. in Business Administration, from the University of Illinois at Urbana-Champaign in 1997.   My major was Organizational Behavior.   My minor = Social Cognition, Statistical Methods.

4.   I received a Bachelors in Business Administration in Accounting and Marketing, University of Wisconsin at Madison in 1987.

**ii. Cases in the Previous Four Years for Which I have Either Testified or had my Deposition Taken as an Expert Witness in the area of Human Resource Management**

a. *Rodrigo Flores, Plaintiff, vs. Merced Irrigation District.* Lawrence Murray, racial discrimination, retaliation, & unlawful termination, Expert for Plaintiff.

b. *Ken Liu v. City and County of San Francisco.*  Lawrence Murray, disability discrimination, failure to reasonably accommodate, Expert for Plaintiff

c. *Jennifer Berch-Saxton v. Pacific International Bearing Sales Inc.* Lawrence Murray, harassment, failure to provide reasonable accommodation, & unlawful termination, Expert for Plaintiff.

d. *Kenneth Lui, vs. City and County of SanFrancisco,* Lawrence Murray, disability discrimination, failure to provide reasonable accommodation, & unlawful termination, Expert for Plaintiff.

e. *Mercy Ambat, et al.,Plaintiffs vs. City and County of SanFrancisco,* Lawrence Murray, gender discrimination, retaliation, & unlawful termination, Expert for Plaintiff.

f. *Maggie Franklin, vs. Sacramento Area Flood Control Agency, a public entity, City of Sacramento, a public agency* Lawrence Murray, racial discrimination, unlawful termination, Expert for Plaintiff

g. Rivera v. Ag Formulators Inc., *Fresno County Superior Court* -- Attorney Dean Gordon& Lawrence Murray, sexual and gender harassment, Expert for Plaintiff

h. Hutchinson v. Rancano & Rancano – Stanislaus County Superior Court -- Attorney Dean Gordon & Lawrence Murray, sexual and gender harassment, Expert for Plaintiff

Declaration of James M. Schmidtke No.C10-03410 EMC

1

2

### iii. Publications

3

5. In the field of Human Resources I have published, either by myself or with others, the following:

a. Fathil, F. M., & Schmidtke, J. M. (2010). The effect of individual differences on accountant's ability to detect fraud. *The International Journal of Auditing, 14,* 163-173.

b. Butler, J. S., & Schmidtke, J. M. (2010). Theoretical Traditions and the Modeling of Sexual Harassment within Organizations: The Military as Data. *Armed Forces & Society,* 36, 193-222..

c. Badhesha, R., Schmidtke, J. M., Cummings, A. & Moore, S. (2008) The effects of specific diversity training on general multicultural attitudes. *Multicultural Education and Technology Journal,* 2(2), 87-106.

d. Schmidtke, J. M. (2007). The relation between social norm consensus, perceived similarity and observer reactions to co-worker theft. Human Resource Management, 46, 561-582.

e. Olson-Buchanan, J. B., Rechner, P. L., Sanchez, R. J., & Schmidtke, J. M. (2007). The Challenges and Outcomes of Implementing a Virtual Team Component in a Management Principles Course. Training and Education, 49, 408-423.

f. Wood, J. L., Schmidtke, J. M., & Decker, D. (2007). Lying on Job Applications: The Effects of Job Relevance, Commission, and Human Resource Management Experience. Journal of Business & Psychology, 22, 1-9.

g. Schmidtke, J. M. (2006) Book Review: Carol Kulik, Human Resources for the Non-HR Manager, Human Resource Management, 45, 149-151.

h. Perry, E. L., Kulik, C. T., & Schmidtke, J. M. (1998). Individual differences in the effectiveness of sexual harassment training. Journal of Applied Social Psychology, 28 (8), 698-723.

i. Perry, E. L., Schmidtke, J. M., & Kulik, C. T. (1998). Propensity to sexually harass: An exploration of gender differences. Sex Roles, 38, 443-460.

j. Perry, E. L., Kulik, C. T., & Schmidtke, J. M. (1997). Blowing the whistle: Determinants of responses to sexual harassment. Basic and Applied Social Psychology, 19, 457-482.

k.      Kulik, C. T., Perry, E. L., & Schmidtke, J. M. (1997). Sexual harassment: A comparison of victim, observer-as-victim, and observer responses. Journal of Managerial Issues, 9, 37-53.

l.      Oldham, G. R., Cummings, A., Mischel, L. J., Schmidtke, J. M., & Zhou, J. (1996). Personal stereos: A new strategy for improving productivity. HR Magazine, 41 (4), 95, 99.

m.      Oldham, G. R., Cummings, A., Mischel, L. J., Schmidtke, J. M., & Zhou, J. (1995). Listen while you work?: Quasi-experimental relations between personal-stereo headset use and employee work responses.  Journal of Applied Psychology, 80, 547-564.

iv.     **Papers Under Review**

6.  I am currently considering, reviewing and working on the following papers in the field of human resources.

a.      Schmidtke, J. M. We can work it out: A restorative justice approach to managing sexual harassment complaints in organizations.  Manuscript in preparation for submission to the Academy of Management Review.

b.      Butler, J. S., & Schmidtke, J. M. Old Southern Codes in New Legal Bottles? Race, Sexual Harassment and Organizational Science.  Submitted to *American Journal of Sociology*.

c.      Schmidtke, J. M. Observer reactions to employee theft: An examination of individual differences and situation characteristics.  Manuscript in preparation for submission to *Social Cognition*.

d.      Schmidtke, J. M., Rechner, P. L., Olson-Buchanan, J. B., & Sanchez, R. J.  Virtual teams: Process matters.  Manuscript in preparation for submission to *Journal of Applied Social Psychology*.

e.      Schmidtke, J. M.  Don't give me excuses, unless it's really bad:  The effects of rationalizations on perceptions of negative behaviors.  Submitted to *Organizational Behavior and Human Decision Processes*.

v.      **Presentations**

7.  I have participated in the following presentations in the area of human resources:

a.      Elliott, J. H., Schmidtke, J. M., Bradley, J. A., & Schmidtke, J. I. (April, 2011). Discrimination Against Employees With Disabilities: Does Timing and Type Matter? To be presented at the Society for Industrial-Organizational Psychology Conference, Chicago.

b.      Sangha, K. J. & Schmidtke J. M. (March, 2011). Strategic Turnover and Strategic Alliance.  The use of turnover and alumni networks to build customer and employee networks.  Presented at the National Business and Economic Society Conference, Curaco.

c.      Sanchez, R. J., Olson-Buchanan, J. B., Schmidtke, J. M., & Bradley, J. A. (April, 2009). It's Just Business: Affective and Cognitive Trust in Virtual Teams.  Presented at the Society for Industrial-Organizational Psychology Conference, New Orleans.

d.      Schmidkte, J. M. & Sturm, C. (August, 2008). Choosing partners for collusion: Who you choose and how you approach them.  Paper presented at the Academy of Management Conference, Anaheim.

e.      Butler, J. S., & Schmidtke, J. M.  (August, 2008).  Impact of Organization History and Culture on Sexual Harassment: Comparing U.S. Military Branches    Paper presented at the Academy of Management Conference, Anaheim.

f.      Schmidtke, J. M. (May, 2007).  The relation between social norm consensus, perceived similarity and observer reactions to co-worker theft.  Paper presented at the Society for Industrial and Organizational Psychologists Annual Conference, New York.

g.      Schmidtke, J. M. (August, 2006). Observer reactions to employee theft: An examination of individual differences and situation characteristics.  Paper presented at the Academy of Management Conference, Atlanta.

h.      Badhesha, R., Schmidtke, J. M., & Moore, S. (August, 2006). The effects of specific diversity training on general multicultural attitudes.  Paper presented at the Academy of Management Conference, Atlanta.

i.      Schmidtke, J. M., Rechner, P. L., Olson-Buchanan, J. B., & Sanchez, R. J. (May, 2006).  The Effects of Leadership and Feedback on Virtual Team Performance. Paper presented at the Society for Industrial and Organizational Psychologists Annual Conference, Dallas.

j.      Sanchez, R. J., Olson-Buchanan, J. B., Rechner, P. L., & Schmidtke, J. M. (May, 2006).  Multiple-Perspective Taking in Team-Member Exchange in a Virtual Environment. Paper presented at the Society for Industrial and Organizational Psychologists Annual

Conference, Dallas.

k.      Butler, J. S., & Schmidtke J. M. (August, 2005). Theoretical Traditions and the Modeling of Sexual Harassment within Organizations: The Military as Data. Paper presented at the Academy of Management Conference, Hawaii.

l.      Sanchez, R. J., Olson-Buchanan, J. B., Rechner, P. L., & Schmidtke, J. M. (April, 2005). The Influence of Personality on Affective Responses to a Virtual Team Environment. Presented at the Society for Industrial-Organizational Psychology Conference, Los Angeles.

m.      Sanchez, R. J., Olson-Buchanan, J. B., Rechner, P. L., & Schmidtke, J. M. (April, 2004). Dispositional Trust and Team-Member Exchange in the Virtual Environment.  Poster presented at the Society for Industrial-Organizational Psychology Conference, Chicago.

n.      Schmidtke, J. M., Rechner, P. L., Olson-Buchanan, J. B., & Sanchez, R. J. (August, 2003). Virtual teams: Process matters.  Paper presented at the Academy of Management Conference, Seattle.

o.      Sanchez, R. J., Olson-Buchanan, J. B., Rechner, P. L., & Schmidtke, J. M. (August, 2003). The Effects of Dispositional Trust and Team-member Exchange in the Virtual Environment.  Paper to be presented at the Academy of Management Conference, Seattle.

p.      Schmidtke, J. M. (November, 1998). Co-Worker Reactions to Employee Theft. Paper presented at the 4th Annual Wharton Organizational Behavior Conference, Philadelphia.

q.      Schmidtke, J. M., & Kulik, C. T. (Co-Chairpersons) (August, 1996). Responses to sexual harassment: A multiple perspective approach. Symposium presented at the Annual Convention of the American Psychological Association

r.      Kulik, C. T., Ambrose, M. L., & Schmidtke, J. M. (May, 1995). Computer-based performance appraisals: The effect of information format and processing goals.  Paper presented at the Midwest Psychological Association Conference, Chicago.

s.      Perry, E. L., Kulik, C. T., & Schmidtke, J. M. (May, 1995). Individual differences in the effectiveness of sexual harassment training. Paper presented at the Society for Industrial and Organizational Psychology Conference, Orlando.

t.      Schmidtke, J. M. (March, 1993).  Whistle blowing: A risk decision model. Paper presented at the I/O Psychology and Organizational Behavior Graduate Student Conference, Toronto.

**vi.    Manuscripts In Preparation:**

8.  I am currently considering, reviewing and working on the following manuscripts in the field of human resources.

a.      Butler, J. S., & Schmidtke, J. M. Old Southern Codes in New Legal Bottles? Race, Sexual Harassment and Organizational Science.  Manuscript in preparation for submission to American Sociological Review.

b.      Schmidtke, J. M., & Butler, J. S.  Can we be all that we can be? The prevalence of different forms of sexual harassment in the Army, Navy, Airforce, and Marines. Manuscript in preparation for submission to Journal of Political and Military Sociology.

c.      Schmidtke, J. M., & Cummings, A. Salient Challenges of Staffing and Managing Employees in the Non-Profit Sector.  Book Chapter for SIOP Frontier Series.

**vii.    Work In Progress**

9.  I am currently considering, reviewing and working on the following in the field of human resources.

a.  Schmidtke & Vadera – The influence of social networks on ethical decision making.  Data collection in progress

b.  Cummings, A., & Schmidtke, J. M., Creativity and negotiation: The relation between individual differences in the Kirton Adaption-Innovation (KAI) inventory and integrative agreements.  Data collection in progress.

c.  Schmidtke J. M. & Delfer, R.  Dishonesty and Excuses:  The effects of excuses on lies compared to intentional acts of omission.  Data Collected

**viii.    Courses Taught**

10. I am currently or have recently taught the following course in the area of human resources:

a.      MBA 210      Leadership and Organizational Behavior.   Through a sequence of readings, lectures, cases, and experiential exercises, course introduces students to frameworks from the social sciences that are useful for understanding organizational processes and teaches them how to apply these frameworks to particular situations.  This course is designed to sharpen students' ability to diagnose and solve a broad range of organizational problems.

b.      MBA 240      Managing Human Capital.  Executive MBA Elective. Course designed to highlight issues related to the design of effective human resource management

Declaration of James M. Schmidtke No.C10-03410 EMC

systems such as recruiting, selection, and performance management that are integrated with the organization's overall business strategy.

       c.      Continuing Education - Management and Prevention of Sexual Harassment. Course designed to improve individuals' abilities to identify, prevent, and manage sexual harassment in the workplace.  Course materials discuss both legal and behavioral definitions of sexual harassment.  Course highlights problems areas for sexual harassment in the workplace, and help individuals develop strategies to reduce sexual harassment that fit the specific needs of their organization.  Also the course addresses the development of policies and procedures designed to reduce and manage incidents of sexual harassment.

       d.      MBA 245      Seminar in Negotiation. Graduate elective topics course. California State University Fresno.  Course designed to teach students the theory, principles, and processes of negotiating in a variety of contexts such as civil disputes, international negotiations, and electronically mediated negotiations.

       e.      MBA 290      Negotiation.  Executive MBA mini Elective. Course designed to introduce students to basic negotiation concepts applied specifically in a business context.

       f.      MBA 243      Seminar in Training, Compensation, and Performance Appraisal. Graduate elective. California State University Fresno This course is designed to teach students the factors that affect the design, administration, and evaluation of: training and orientation programs, compensation systems, and performance management systems for the purposes of motivating and maintaining a qualified workforce.

       g.      MGT 104      Administrative Principles of Management.  Required undergraduate course, California State University Fresno.  Focus on planning techniques, organization theory, and ethical control processes in domestic and international business. Case analysis, management simulations, and written projects.  Course was developed to be completely web-based.

       h.      MBA 245      Negotiation and Conflict Resolution. Graduate elective, California State University Fresno.  This course is designed to teach students the theory and processes of individual, group, and organizational conflict resolution and negotiation as applied to a variety of contexts.

       i.      HRM 154      Compensation Administration. Undergraduate elective, California State University Fresno.  Discusses issues related to the design and implementation of

8

compensation systems.  Discusses economic, legal, and motivational aspects of compensation systems.

j.   MGT 110   Administration and Organizational Behavior. Required undergraduate course, California State University Fresno.  Combined basic management and organizational behavior undergraduate course.

k.   HRM 150   Administration of Personnel. Undergraduate elective, California State University Fresno.  Overview of the personnel function, covering recruitment, compensation, equal employment, job analysis, training, benefits, employee discipline, collective bargaining, safety, and health.

l.   MAN 383.15   Context of Human Resource Management. Required course for the Masters in Human Resource Development and Leadership degree.  An executive education joint degree program, University of Texas at Austin.  Special topics in human resource management - such as diversity, work/family issues, international HR, organizational justice.

m.   MAN 383.15   Art & Science of Negotiation.  Elective MBA course, University of Texas at Austin. This course is designed to teach students the theory and processes of negotiation as applied to a variety of contexts.

n.   MAN 336H   Honors section of Organizational Behavior and Administration. Required undergraduate course for Business honors students, University of Texas at Austin. Course focuses on the process of managing organizations and the behavior of individuals and groups within the organizational setting.

o.   MAN 325   Personnel/Human Resource Management. Undergraduate elective, University of Texas at Austin.  Overview of the personnel function, covering recruitment, compensation, equal employment, job analysis, training, benefits, employee discipline, collective bargaining, safety, and health.

p.   MAN 383.10   Strategic Human Resource Management. Elective MBA course, University of Texas at Austin.  Overview of human resource management, focuses on using human resource policies as a strategic tool to maximize firm performance.

q.   MAN 336   Organizational Behavior and Administration. Required undergraduate course, University of Texas at Austin.  Course focuses on the process of managing organizations and the behavior of individuals and groups within the organizational setting.

r.   B A 389T.   Organizational Behavior.  Required MBA course, University of Texas at Austin.  Course was subsequently removed from core requirements.  Course discussed

the development of the general areas of theory most central to dealing with the varieties of social/psychological behavior of direct import to the administrator and manager.

### ix.      Other Profession Activities:

11. In addition to the foregoing, I have and am currently providing professional assistance, opinions, information and directives as follows:

a.   Consultant – Conflict Resolution.  Provided conflict resolution services to Clovis Community Hospital to help the resolve an on-going dispute in one of their units.

b.   Served as Professor in Residence for Saladinos Inc., Fresno CA.  Provided feedback to executive board.  Designed a employee satisfaction survey.

c.   Provided training on Communication Skills, Negotiation Skills, Human Recourse counseling, and Sexual Harassment Awareness for multiple companies in the Fresno Area.

d.   Expert witness services for court proceedings and advisory information on a regular basis to attorneys throughout the United States in the field of Human Resources standard of care, philosophy, and trends.

### x.   Service Activities:

y.   I have and am currently participate in outside service activities as follows:

**a.**   California State University Fresno, Service-Learning Subcommittee of the Academic Senate.

b.   California State University Fresno, Student Academic Petitions Committee (2010 – Current).

c.   Conducted Ethics Training for The Economic Development Certificate Program at Fresno State offered in collaboration with California Association for Local Economic Development (CALED) and the California Academy for Economic Development (2010, 2011).

d.   California State University Fresno, Craig School of Business, Chair of the Committee on Graduate Programs (2008 - current).

e.   Supervisory Training for Regional Jobs Initiative, California State University Fresno, University Business Center (2006).

f.   California State University Fresno, Ethics Center Steering Committee Member (2004-2006).

Declaration of James M. Schmidtke No.C10-03410 EMC

g.   California State University Fresno, Chairperson of the Professional Development Sub-Committee of the Academic Senate (2005-current).

h.   California State University Fresno, Member of the Professional Development Sub-Committee of the Academic Senate (2002-2005).

i.   California State University Fresno, Craig School of Business, Member of the Committee on Resources (2004-2005).

j.   California State University Fresno, Craig School of Business, Member of the Committee on Undergraduate Programs (2005 - current).

k.   California State University Fresno, Craig School of Business, Chairperson of the Task Force on Core Curriculum Reform (2003-2004).

l.   California State University Fresno, Craig School of Business, Member of the Task Force on Core Curriculum Reform (2002-2003).

m.   Craig School of Business, California State University Fresno, Chairperson of the Committee for Student Affairs (2003- 2004).

n.   Craig School of Business, California State University Fresno, Member of the Committee for Student Affairs (2001- 2003).

o.   University of Texas at Austin, Member of the Subcommittee on the Sexual Harassment of Students (1997).

p.   Frandsen, M. L. CEO Succession and stockholder reaction: Do demographic characteristics matter? Dissertation committee member. Defended April 24, 2003.

q.   Carrell, R. The use of precision in falsification attempts. Dissertation committee member. Defended March 8, 2004.

r.   Hannah, D. R.  An investigation of the effects of trade secret protection procedures and psychological contract violations on employees' tenedencies to divulge trade secrets August, 2000.

s.   Sat on multiple committees to write and evaluate qualifying examinations both in the Management Department and for the Pharmacy Administration Department. (1996-2001).

### xi.   Honors And Awards

z.   I have receive d the followings honors, awards and grants:

a.   Craig Fellow, Sid Craig School of Business 2007-2009, 2011-2013

b.   Sabbatical – Sid Craig School of Business 2010-2011.

c.   Sid Crag School of Business.  Excellence in Teaching. 2008-2009.

    d.   Business Associates Innovative Program Projects (BIPP) Grant

    e.   California State University Fresno, Grant for Research, Scholarship, & Creative Activities.  Fall 2002, 2003, 2003, 2005, 2011.

    f.   Sid Craig School of Business.  Summer Research Grant.  Summer 2002.

    g.   Sid Crag School of Business.  College Mini-grant. Summer/Fall 2002.

    h.   California State University Fresno, Grant for Research, Scholarship, & Creative Activities.  Fall 2002.

    i.   University of Illinois Incomplete List of Teachers Ranked as Excellent by Their Students, Fall 1995


    **xii.   Professional Activities**

aa. I have and am currently participate in the following professional activities:

    a.   Member, Academy of Management

    b.   Member, American Psychological Association

    c.   Editorial Board, Journal of Business and Psychology

    d.   Ad hoc Reviewer, Human Resource Management

    e.   Ad hoc Reviewer, Theory and Society

    f.   Ad hoc Reviewer, Academy of Management

    g.   Ad hoc Reviewer, Journal of Applied Social Psychology

    h.   Advisory Board, Fellowship of Christian Athletes, Fresno CA.

    i.    Invited Speaker, Valley Employers Association, Fresno, CA.

    **xiii.   Employment Experience**

bb. I have had the following work experiences:

    a.   2007 - present, Associate Professor, California State University Fresno, current, Responsibilities include developing and teaching undergraduate and graduate level courses, advising honors and masters students. conducting research, and serving on several committees.

    b.   2009 – present, Instructor, Indian School of Business, Hyderabad IN.  Taught graduate level course in the MGTO program.

    c.   2001 - 2007 Assistant Professor, California State University Fresno. Responsibilities include developing and teaching undergraduate and graduate level

Declaration of James M. Schmidtke No.C10-03410 EMC

courses, advising honors and masters students. conducting research, and serving on several committees.

d.   1996 - 2001   Assistant Professor, University of Texas at Austin. Responsibilities include developing and teaching graduate level courses, advising Ph.D. students, conducting research, and serving on several committees.

e.   1991-96  Research Assistant to Professor Carol Kulik.  Research topics included affect, sexual harassment, and computerized performance monitoring. Responsibilities included experiment development and execution, stimulus material design, data coding and analysis, and supervision of undergraduate research assistants.

f.   1989-91 Senior Accountant, BDO Seidman.  Conducted audits of financial statements for companies varying in size and industry. Responsibilities included planning and executing audits; training, supervision and evaluation of various staff accountants; and client development.

g.   1988-89       Financial Analyst, Ernst & Young.  Performed company valuations for clients on companies within the appliance and microprocessor industries. Responsibilities included researching industries, analyzing merger transactions, and analyzing environmental, legal, and financial issues for specific industries.

h.   1987-88       Staff Accountant, Ernst & Young.  Assisted senior accountants in performing audits. Responsibilities included creating/modifying audit procedures, performing effective and efficient audits.


xiv.   **Materials Reviewed In Preparation of This Declaration & Expert Opinion**

cc.  I have reviewed and considered the following in preparation of my declaration and expert opinion:

    a.   Complaint for Damages, Equitable, and/or Injunctive Relief

    b.   Defendants' Answer to Plaintiff's Unverified Complaint

    c.   ENE Statement of Defendants City of Berkeley and David Hodgkins

    d.   Plaintiff Timothy Gardner's Early Neutral Evaluation Statement

    e.   The Deposition of BPD Chief Douglas Hambleton, retired.

    f.   The Deposition of BPD Chief Eric Gustafson, retired.

Declaration of James M. Schmidtke No.C10-03410 EMC

g.  The Deposition of David Hodgkins, Director of Human Resources, City of Berkeley.

h.  The Deposition of Timothy Gardner, plaintiff

i.  The Deposition of David Frankel

j.  The Declaration of Randolph Files

k.  The Declaration of Sean McCann

l.  The Declaration of Dennis LaCalle

m.  MOU between the City of Berkely and Berkeley Police Association

n.  League of California Cities, Summary of Existing Policy and Guiding Principles, March 2008, 2010

o.   CalPERS Publication: Completing Your CalPERS Disability Retirement Election Application

p.  CalPERS Publiction: A Guide to CalPERS Reinstatement From Retirement

q.  Personal Statements of Timothy Gardner

r.  Performance appraisals provided by Timothy Gardner

s.  Lists of Officers who retired and those who have been reinstated

t.  Testing and Oral Board Evaluations of lateral applicants for 2009.

u.  The Complaint and Responses to the Complaint filed.

v.  Heilman M. D., & Haynes, M. C. (2005). No credit where credit is due: Attributional rationalization of women's success in male-female teams. *Journal of Applied Psychology,90,*905-916.

w.  Anthony, W. P., Kacmar, K. M., & Perrewe, P. L. (2009). *Human Resource Management: A Strategic Approach (6th Edition).*Fort Worth, TX: The Dryden Press, Harcourt Brace College Publishers.

x.  DiFonzo, N., Bordia, P. (2007). *Rumor Psychology: Social and Organizational Approaches.*  Washington, DC: American Psychological Association.

y.  Donovan, P. (2002). Crime legends in a new medium: Fact, fiction, and loss of authority. *Theoretical Criminology, 6,*189-215.

**xv. Observations, Opinions and Conclusions**

Declaration of James M. Schmidtke No.C10-03410 EMC

I have made the following observations, opinions and conclusions as it relates to the conduct of the Berkley Police Department (BPD) regarding Tim Gardner, based upon the information I had available up until November 21, 2011.

**i.   Discrimination –Negative attitudes toward individuals who took medical leave, which contributed to the motivation for failing to rehire BPD Officers who were on medical retirement**

a. There appears to be a negative attitude toward any employee who misses extended periods of work because of an injury.  Tim Gardner was told that when he needed to have surgery on his shoulder by Sergeant Cary Kent that "it is not a good time to be injured." (Gardner 203: lines 22-25).  Further, when David Frankel asked Chief Hambleton what were the chances of him being rehired Hambleton said something to the effect that Tim's chances were not good, because what would stop him from coming back here and getting injured again just to go out for more money? (Frankel 27: lines 1-7; Gardner 81: lines 11-13).  In addition, Hambleton made disparaging remarks about Officer Sean McCann when Hambleton was informed about McCann's type 1 diabetes (McCann Declaration point 3). Further in his deposition, former acting Chief Eric Gustafson stated "I mean, are people afraid to do medical -- to file medical claims because they're afraid they are going to lose their job and not be a police officer? Sure" (Gustafson 71: lines 1-5).  This statement suggests that there was an awareness that employees felt that their employment would suffer if they filed a medical claim.  Further, the fact that this statement was made by someone at the top level in the organization suggests a passive compliance with this idea since they took no action to dispel this fear among employees.  Taken together these instances indicate that employees having any type of disability were viewed negatively by individuals who were responsible for making employment decisions.  From a Human Resource perspective, the goal of any organization would be to eliminate these types of biases, yet the leadership of this organization seemed to embrace these negative attitudes rather than work to eliminate them.

b. There appears to be an issue of discrimination against anyone who has sustained an injury, taken medical retirement, and sought to be rehired by the Berkley Police Department.  The list of officers who were separated from the BPD contains individuals who were medically retired and those that ended their employment for some other reason.  Although several of the non-medically retired officers have received further employment, either through reinstatement or other assignments, none of the medically retired employees have been reinstated (Hodgkins

64: lines 20 – 66: lines 5; Hambleton, 119: lines 11-14; 148: line 1-7).  Several employees, Rick Ramos, Cheryl Lindenau, and Tim Gardner all requested reinstatement. BPD did not engage in any type of discussion with these individuals to determine whether reinstatement was a reasonable option to consider even though they hired multiple officers at the time these requests were made (Hambleton 144:line 25-146: line 250).  In addition, Sean McCann stated that when his medical retirement neared he was compelled to sign a document that in exchange for his medical retirement he would never apply for employment with the City of Berkley again regardless of the status of his condition (McCann declaration point 6).

c.   It appears that individuals give weight to opinions with respect to hiring decisions rather than relying on more objective information that is produced by the hiring process.  The problem is that opinions are highly subjective and can lead to significant biases in the hiring process (Heilman & Hanes, 2005).   This potential for bias also relates to BPD's performance appraisal system.  Although I would assume that the appraisal process and system was developed in a way to reliably assess valid performance indicators, it appears that managers at higher levels did not think it accurately assessed on performance, and, in fact, thought performance ratings should be disregarded.  Eric Gustafson stated in his deposition that "But they [performance appraisals] are so subject to rating flaws that it is one piece of information. I would never make a judgment solely based on what appears in the performance appraisal report," (Gustafson 52: lines 11-13).  He goes further to say that performance should be assessed, "People's personal opinions, people's judgments about an officer's effectiveness or ability," (Gustafson 52: line 4).  This runs completely contrary to accepted human resource standards (Anthony, Kacmar, & Perrewe, 2005; Heilman & Haynes, 2005). In such cases where objective criteria is ignored or discounted in exchange for reliance on a manager's personal opinions, there is a significant potential for bias and discrimination to enter into the process.

d.   Finally, it appears that BPD did not comply with policy recommendations of the League of California Cities. They were a member of this organization and in fact, David Hodgkins was a former board member of the organization.  The organization developed a policy of which the goal was to re-employ city employees who are been put on medical or disability retirement.  The League of California Cities' guiding principles state:…

> The League supports: (a) reducing all disability retirement
> payments for employees hired after a certain date;
> (b) imposing an earnings test for persons receiving industrial

Declaration of James M. Schmidtke No.C10-03410 EMC

disability retirement; (c) requiring state departments to
identify annual unemployment and disability payments
in separate budget items; (d) requiring persons receiving
disability retirement payments to obtain an annual medical
examination; (e) prescribing a 60% cap on payments
for either job-related or non-job-related disabilities;
(f) eliminating the tax-exempt status of disability retirement
payments; (g) requiring mandatory reinstatement for
employees certified able to work by medical exam; and
(h) discontinuing disability retirement payments if the
employee rejects reinstatement.  (League of California Cities)

It is clear from sections g & h that the goal for any city or municipal agency is to reinstate individuals who were on disability retirement if later they were able to return to work. Clearly BPD's actions are inconsistent with these policy recommendations.  Further it should be noted that this policy is consistent with the policy that was drafted in 2008 while David Hodgkins was on the executive board of the League of California Cities. So Hodgkins should have been well aware of the policy and the goal of reinstatement.  In addition, Hodgkins indicated that he was not aware of CalPERS policy on reinstatement and that he would follow its policy because the City of Berkeley was a member of CalPERS (Hodgkins 25: lines 2-24).  CalPERS does have a policy on reinstatement such that once an individual files an application for reinstatement "That agency will determine your eligibility for reinstatement," (CalPers: A Guide to CalPERS Reinstatement From Retirement, page 7). BPD or the City of Berkeley did not engage in any good faith effort to determine Gardner's eligibility for reinstatement.  Further CalPERS, in their publication for disability retirement application (page 15) states that:

If you recover from the injury or illness that resulted in your disability or
industrial disability retirement and you wish to return to work for a
CalPERS covered employer, you must first apply for reinstatement from
retirement. If new medical evidence shows that you have recovered, you
will be approved for reinstatement from retirement. State members may
have a mandatory right to return to the job classification from which they
retired. Once you are reinstated and return to employment, your retirement
allowance will stop, and you will again be an active CalPERS member.

Thus there appears to be a clear policy goal of trying to get individuals who are able to go back to work to be reinstated.  In fact, the policy suggests that in some cases it may be mandatory to reinstate individuals who were on medical retirement.  It is problematic that the Director of Human Resources, David Hodgkins, did not know whether a policy existed or what the policy was.  Moreover, it is clear that the City of Berkeley was not following

Declaration of James M. Schmidtke No.C10-03410 EMC

these policy recommendations.   Again, accepted Human Resource Practices would be to follow an organizations prescribed policies.

e.  Finally, BPD has a policy that anyone who separates from the organization (except in the case where they are terminated for cause) must request reinstatement within a 2 or 3-year period, otherwise they must re-enter the organization as a new applicant or lateral applicant. First, it should be noted that neither Hodgkins, Hambleton, nor Gustafson could recall the specific policy as to whether it was 2 or 3 years.  Further, none of them could cite the specific policy or knew where the policy could be located.  Second, this places a burden on individuals who may be recovering from a medical disability.  Depending on the nature of the disability or the estimated time frame for recovery from an injury, this policy may have a discriminating effect against individuals who have sustained more serious injuries.  As far as I can see from the records I have been provided, there is no organizational basis as to why there is a limited time period.  From a Human Resource Management perspective, putting a time limit on reinstatement places an unnecessary hurdle on disabled employees trying to return to work after an injury.  Indeed Randolph Files, former President of the Berkley Police Association (BPA), who is the bargaining agent for all sworn BPD positions. Files had been involved in numerous negotiations between the City of Berkley and BPA.  He was involved in the negotiation that created section 39 of the Memorandum of Understanding (MOU) which is the employment agreement between the City and BPA.  Section 39 is the provision discussed above that allows former officers who resigned to be rehired without going through the formal application process. According to Files, this provision was specifically created for those officers who "resigned" and does not cover individuals who retired, for any reason (Files declaration points 8-10).  This 2 year limit policy is not only inconsistent with Accepted Human Resource Management Practice but it is also inconsistent with the organization's own policies.

**ii.  Discrimination Regarding Officer Gardner By The BPD**

f.  This discrimination against individuals with disabilities is also demonstrated for Tim Gardner's case.   In 2003, Dr. Roger Hicks issued a report indicating that Gardner was cleared for full duty (Gardner 47: lines 1-5; Exhibit 7).   In addition, on January 28, 2003 Dennis Lacalle, PT issued a report after he performed a physical assessment of Tim's ability to perform the functions of a BPD office (LaCalle declaration).  Both Hicks and LaCalle indicated that Gardner was cleared for full duty without restrictions.  On November 20, 2002,

Gardner sent a request via letter for reinstatement to Roy Meisner and received no response. On January 24, 2003, he followed up with Administrative Captain Bobby Miller.  When Gardner inquired about his request he was informed by Personnel and Training Sergeant, Kelly Gordon that there was a hiring freeze and that she had not heard of his request for reinstatement.  In February, 2003 two lateral officers were hired.  In 2006, David Frankel spoke with Captain Gustafson about the chance of Gardner being rehired.   Again Gustafson's response was something to the effect that Tim was not liked by the black command staff (Frankel 34: lines 19).  In June 2007, Gardner made a second request for reinstatement notify the BPD of his successful rehabilitation.  He requested a meeting to discuss the process for reinstatement (Gardner Exhibit 9).  His request for a meeting was denied and he was informed that he would need to apply as a new recruit.  In 2008 four lateral officers were hired.  In 2009 Gardner applied as a lateral recruit.  He scored in the top category as "best qualified."  Gardner completed all background questionnaires.  He was informed in June 2009 that there was a hiring freeze.  In July 2009, two other lateral candidates were offered employment by BPD.  Given that the selection process indicated that Gardner was in the best qualified category, that he had experience working in this department (which neither of the candidates who were hired had) and had a history of meeting and exceeding job requirements, he was passed over for employment.   Further, Schofield and Morizono never spoke with any of Gardner's previous supervisors or anyone who worked with Gardner on a regular basis who would have been in a position to evaluate Gardner's performance on the job.

        In addition to this Hambleton stated that he had heard rumors that the only reason Tim wanted to return to work was that he could get re-injured and then that re-retire with a medical disability at higher pay rate (Hambleton 113: lines 5-21).  Although he stated that he did not believe the rumors, he spread them to other people who were involved in the decision making process ((Hambleton 114: lines 3-17).  If he was truly interested in reducing the discrimination associated with Gardner's disability, he should have acted to dispel those rumors and not spread them any further.  Research suggests that the longer rumors are allowed to continue without efforts to dispel them, the more likely people are to believe them and continue to believe them even in the face of contrary evidence (DiFonzo & Bordia, 2007; Donovan, 2002).  Thus Hambleton's failure to try to dispel the rumor in this case increase the likelihood that people would believe it and would continue to believe it even if they

1    encountered information to the contrary.  Thus, it is reasonable to suspect that his injury was

2    a factor in the decision not to consider him for employment.

3    g.   The last issue discussed in the above paragraph I believe requires further discussion.  There

4    appears to be no clear process by which the final employment decision to hire specific

5    candidates is made.  There appears to be confusion as to who the decision maker is.  For

6    example, Hodgkins in his deposition suggests that the chief is the person responsible for

7    making the final hiring decision (Hodgkins 24: lines 5-6), while Chief Hambleton suggests

8    that the decision is made by a lieutenant who then recommends a person to the captain who

9    then makes a recommendation to the chief (Hambleton 60: line 8 – 62: line 12).  Gustafson

10   suggests that it was the Lieutenant and Sergeant who ultimately make the decision who to

11   hire (Gustafson 19: lines 19-24).  These apparent inconsistencies suggest two things: **First**,

12   from an organizational standpoint there does not appear to be a clear process for how

13   individuals become selected for employment.  This again, runs contrary to accepted Human

14   Resource Practices.  The selection system should follow a standardized process to ensure that

15   every applicant is treated consistently and that bias in the process is reduced.  Without a clear

16   systematic process, the potential for discrimination becomes greater.  This lack of a

17   systematic process is further evidenced by the fact that Gustafson has no idea what factors

18   Lieutenant Morizono and Sergeant Schofield considered when they may the decision not to

19   forward Tim's candidacy (Gustafson 17: lines 19-24).  **Second**, there is no training provided

     to individuals who are involved in the selection process on how to properly select candidates.

     This training would also include how to avoid discrimination (including that of disability

     discrimination and reasonable accommodation) in the process.

20           Accepted Human Resource Practice would be to train those involved in the selection

21   process how to use the selection system and avoid many of the common traps that can lead to

22   bias and discrimination.  According to Hambleton, he did receive some human resource

23   management training (Hambleton 34: line 24 – 35: line 12) but he could not recall specifics

24   of that training.  This suggests that Hambleton was not aware of the requirements of the

25   Americans with Disabilities Act or the requirements for Reasonable Accommodation,

     indicating that the human resources training provided to officers in the BPD was insufficient.

26   **iii.  Good Faith Interactive Discussion To Seek a Reasonable Accommodations**

27   h.   The goals of standard human resource practices in making reasonable accommodations for

28   injured/disabled employees is for an employer to retain injured employees, who can

Declaration of James M. Schmidtke No.C10-03410 EMC

1    successfully complete essential job functions.   This is especially important where there is

2    substantial investment in an employee through training and experience, such as was the case

3    with Officer Gardner.   These accommodations should represent a good faith effort of

4    employers and employees working together to modify, alter or restate work to permit the

     employee to continue working.

5  i.  The standard set forth in California and federal standards include job restructuring and other

6    modifications of the work environment and responsibilities in an effort to keep the employee

7    working.

8  j.  Berkley Police Department did not engage in any type of interaction with Officer Gardner.

9    According to Gardner, "Captain Hambleton, who was the administrative captain, called me

10   into the office and told me that the City was going to retire me," (Gardner 108: lines 8-10).

11   When Officer Gardner questioned this, Hambleton responded that your doctor has put

12   limitations on your work that we will not accept (Gardner 108: lines 13-15).  There was no

13   interactive discussion as to whether accommodations could be made or whether Gardner

14   would be expected to recover from his injuries.  In addition, there were multiple requests

15   made by Tim Gardner between 2002 and 2009 (Gardner Exhibits 9,11,12) to engage in a

16   discussion about how he might return to his job as an officer yet there was no interest on the

17   other side to hold such a discussion.  Hodgkins acknowledges that he received Gardner's

18   request but did nothing (Hodgkins 30: line 15 – 31: line 20).  Hambleton also acknowledges

19   a discussion he had with Hodgkins about Tim's request pursuant to a government code

20   (Hambleton 94: line 17 – 95: line 1).  My assumption is that he was referring to California

21   Code 21192 which required the City to go through the process of determining whether Tim

22   could perform the job that he was medically retired from once he applied for reinstatement.

23   According to his testimony Hambleton did nothing  (Hambleton 95: line 4).  This

     demonstrates that Hambleton had no interest in engaging in the process of trying to reinstate

     or reasonably accommodate Tim in his application to be reinstated.  This is inconsistent with

     what would be considered acceptable Human Resource practices.

24 **i.     Failure To Reasonably Accommodate**

25 k.  If the BPD had accepted the treating physician's statement, that Gardner was cleared for

26   "Full Duty" as of January 2003, they could have considered reinstatement as they made

27   offers of employment to lateral officers in February of 2003.

28

l.   In addition there have been multiple opportunities to reinstate officer Gardner between 2006 and 2009 because there were lateral openings that were filled by other officers.

m.   The conduct of the BPD and that of Chiefs Hambleton and Gustafson falls far short of the standards for a reasonable accommodation of accepted Human Resource practice.

My fee rate is $200 per hour and I have been paid a retainer of $250 in advance.

As of November 21, 2011 I have spent approximately 16 hours reviewing deposition, other provided materials, references and preparing my report.  The outstanding balance due $2950 has not yet bet billed.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed under the laws of the State of California on November 21, 2011.

Dr. James M. Schmidtke

Declaration of James M. Schmidtke No.C10-03410 EMC